Joseph P. LYNCH, Plaintiff,

v.

J.P. STEVENS & CO., INC., Thomas C.
Durst and the J.P. Stevens & Co., Inc.
Pension Committee, Defendants.

Civ. A. No. 88–2919.

United States District Court,
D. New Jersey.

Feb. 14, 1991.

Henry J. Daaleman, Westfield, N.J., for plaintiff.

Stephen N. Dermer, Lowenstein, Sandler, Kohl, Fisher & Boylan, Roseland, N.J., for defendants.

## TABLE OF CONTENTS

| | Page |
|---|---|
| FACTS | 982 |
| A. The Stevens Salaried Plan | 982 |
| B. Salaried Plan Management Prior to the Restructuring | 983 |
| C. Plan Restructuring and Reversion | 984 |
| D. The Window | 987 |
| DISCUSSION | 990 |
| A. The Restructuring and Reversion | 991 |
| 1. Basis for Remedy Claimed by Lynch | 991 |
| 2. The Restructuring and Reversion—ERISA's Exclusive Benefit Rule and Provisions on Fiduciary Duties | 992 |
| a. Benefits Protected Under ERISA | 992 |
| b. Plan Terminations Under ERISA and ERISA's Exclusive Benefit Rule and Fiduciary Duty Provisions | 993 |
| c. Transfers of Plan Assets Under ERISA and ERISA's Exclusive Benefit Rule and Fiduciary Duty Provisions | 996 |
| 3. Funding of Accrued Benefits for Salaried Plan Participants and the Implementation of the Restructuring and Reversion | 999 |
| a. Funding for Benefits for Future Service | 999 |
| b. Funding of Benefits Accrued through 26 June 1985 | 1001 |
| c. Funding for the Window | 1003 |
| d. Funding for the Increase in Salaried Plan Benefits | 1003 |
| e. Funding for Early Retirement Subsidies | 1004 |
| 4. The Management of the Salaried Plan and ERISA's Exclusive Benefit Rule and Fiduciary Duty Provisions | 1007 |
| a. The Management Practices of Stevens with Respect to the Salaried Plan and ERISA's Exclusive Benefit Rule and Fiduciary Duty Provisions | 1007 |
| b. Management of the Salaried Plan by Stevens and the Allegation of Fraud | 1008 |
| c. Use of Investment Managers and ERISA's Exclusive Benefit Rule | 1009 |
| d. Increase in the Actuarial Assumptions and ERISA's Exclusive Benefit Rule and Fiduciary Duty Provisions | 1009 |
| e. Stevens' Alleged Use of Salaried Plan Assets for the Benefit of the Hourly Plan and ERISA's Exclusive Benefit Rule and Fiduciary Duty Provisions | 1010 |
| f. Stevens' Alleged Use of Retiree Plan Assets for the Benefit of the Salaried Plan and ERISA's Exclusive Benefit Rule and Fiduciary Duty Provisions | 1012 |

**980**

| | | | Page |
|---|---|---|---|
| | g. | The Propriety of "Speculative" Investments and ERISA | 1012 |
| | h. | Segregation of Salaried Plan Assets and ERISA | 1013 |
| 5. | | Notice to Salaried Plan Participants of the Restructuring of the Salaried Plan and ERISA | 1014 |
| B. | | The Window | 1016 |
| CONCLUSION | | | 1020 |

## OPINION

LECHNER, District Judge.

Plaintiff Joseph P. Lynch ("Lynch"), a former employee of defendant J.P. Stevens & Co., Inc. ("Stevens"), brought this action against defendants Stevens, Thomas C. Durst ("Durst") and the J.P. Stevens & Co., Inc. Pension Committee (the "Pension Committee") (Stevens, Durst and the Pension Committee are collectively referred to as the "Defendants," and Lynch and the Defendants are collectively referred to as the "Parties"). Jurisdiction is alleged pursuant to the Age Discrimination in Employment Act of 1967 (the "ADEA"), 29 U.S.C. § 624(a), and the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.*

Lynch filed his complaint (the "Complaint") on 29 June 1988. While the Complaint states three counts, the actions of the Defendants alleged therein are described throughout the Complaint and may be grouped into six categories. First, Lynch alleges the Defendants violated various provisions of ERISA in restructuring the Salaried Employees Retirement Salaried Plan (the "Salaried Plan") of which Lynch was a participant and in recapturing

$112 million in assets deemed surplus. Second, Lynch alleges the early retirement incentive offered to corporate area employees (the "Window") who elected to retire by a designated date violated the ADEA. Third, Lynch alleges he was improperly denied Window benefits because he was in fact a corporate area employee. Fourth, Lynch alleges he was terminated from employment and not offered an alternative position within Stevens in violation of the ADEA and the Stevens personnel policy. Fifth, Lynch alleges the current Salaried Plan (the "On-Going Plan") has been inadequately funded since the restructuring and recapture. Finally, Lynch alleges the Defendants failed to provide him with information regarding the Window in violation of the procedural provisions of ERISA.

■ Lynch seeks as relief reinstatement to his former position at Stevens, back pay and benefits, and "compensatory and punitive damages for emotional stress, humiliation, and breach of expressed and implied contract." Complaint at 15–16. Lynch also apparently seeks injunctive relief "[t]hat [Stevens] salaried employees pension plan be fully funded" and attorneys' fees. Complaint at 15–16.[1]

The Defendants now move for summary judgment[2] on the Complaint insofar as it

---

1. In addition, Lynch appears to seek injunctive relief ordering the Defendants to restore the assets recaptured to the Salaried Plan. Opposition at 65. However, this request for relief is not included in the Complaint and is therefore not properly before this court and will not be considered.

2. In support of their motion for summary judgment (the "Motion"), the Defendants have submitted: the Memorandum in Support of Defendants' Motion for Summary Judgment (the "Defendants' Memorandum"); the Certification of Allan Taylor Nance (the "Nance Cert."), and all exhibits attached thereto, including the Retirement Pension Plan effective 1 January 1983 (the "1983 Plan"), attached as Exhibit A, the Retire-

ment Pension Plan for participants not retired as of 1 July 1984 (the "On-Going Plan"), attached as Exhibit B, the Retirement Pension Plan for participants retired as of 1 July 1984 (the "Retiree Plan"), attached as Exhibit C, the Master Retirement Pension Trust for Employees of J.P. Stevens & Co., Inc. and Subsidiaries (the "Master Trust"), attached as Exhibit D, the 17 August 1982 inter-office memorandum from John J. Zerrenner ("Zerrenner") to Whitney Stevens, Ward Burns and J.W. Wagner (the "17 August 1982 Zerrenner Memo. to W. Stevens et al."), attached as Exhibit E, the 17 April 1984 Proposal to Restructure the Stevens Salaried Pension Plan (the "Restructuring Proposal"), attached as Exhibit F, the 17 April 1984 Minutes

relates to the restructuring of the Salaried Plan, to the recapture of assets deemed surplus and to Window Benefits.[3] Because there is no genuine issue of material fact

of the Board of Directors Meeting (the "17 April 1984 Board Minutes"), attached as Exhibit G, the 5 April 1985 Pension Benefit Guaranty Corporation ("PBGC") Notice of Sufficiency (the "Notice of Sufficiency"), attached as Exhibit J, the 25 April 1985 letter from the PBGC to Stevens (the "25 April 1985 PBGC Letter to Stevens"), attached as Exhibit K, the 25 June 1985 letter from the Internal Revenue Service ("IRS") to Stevens (the "25 June 1985 IRS Letter to Stevens"), attached as Exhibit L, the 26 June 1985 letter from Northern Trust to Stevens (the "26 June 1985 Northern Trust Letter to Stevens"), attached as Exhibit N, the 18 May 1984 letters from Stevens to Salaried Plan participants (the "18 May 1984 Stevens Letters to Participants"), attached as Exhibit O, the 27 June 1985 letters from Stevens to Salaried Plan participants (the "27 June 1985 Stevens Letters to Participants"), attached as Exhibit P, the 17 April 1984 Press Release (the "Press Release"), attached as Exhibit Q, the Notice to Interested Parties, attached as Exhibit R, the Form 5310— Notice of Transfer of Assets and Liabilities (the "1 June 1984 Stevens Letter to IRS"), attached as Exhibit S, the 19 June 1984 Notice of Plan Termination to the PBGC (the "19 June 1984 Notice to PBGC"), attached as Exhibit T, the 19 May 1986 letter from Stevens offering the Window (the "19 May 1986 Stevens Letter to Window Offerees"), attached as Exhibit U, the J.P. Stevens & Co., Inc. Pension Fund Investment Manager Restructure ("Investment Manager Restructure"), attached as Exhibit DD, and the 21 May 1984 Resolution of Stevens' Executive Committee (the "21 May 1984 Executive Committee Resolution"), attached as Exhibit EE; the Certification of Henry J. Anderson (the "Anderson Cert."); the Certification of Terry E. Thornton (the "Thornton Cert."), and all exhibits attached thereto, including the Answers to Defendants' First Set of Interrogatories and Request for Production of Documents (the "Lynch Answers to Interrogatories"), attached as Exhibit B, excerpts from the transcript of the deposition of John J. Zerrenner (the "Zerrenner Dep."), attached as Exhibit C, and the 6 December 1989 letter from Stephen N. Dermer, counsel for the Defendants, to the Court recapitulating the agreement reached among the Parties with respect to issues to be addressed in the summary judgment motion (the "6 December 1989 Dermer Letter to the Court"), attached as Exhibit F; the Certification of Thomas C. Durst (the "Durst Cert."), and all exhibits attached thereto, including the resolution of the Stevens Board of Directors ratifying the Window as an amendment to the On–Going Plan (the "21 January 1987 Board Resolution"), attached as Exhibit J, the list of Questions and Answers (the "Questions and Answers"), attached as Exhibit M, and the minutes of the 9 March 1988 meeting of the Pension Committee (the "9 March 1988 Pension Committee Minutes"), attached as Exhibit S; the Certification of William A. Holt (the "Holt

Cert."), and all exhibits attached thereto; the Certification of Thomas E. Hardy (the "Hardy Cert."), and all exhibits attached thereto, including the Deferred Annuitant Certificate for Lynch (the "Deferred Annuitant Certificate"), attached as Exhibit C; the Supplemental Certification of Allan Taylor Nance (the "Supp.Nance Cert."), and all exhibits attached thereto, including excerpts from the transcript of the deposition of Zerrenner (the "Zerrenner Dep."), attached as Exhibit C; the Supplemental Certification of Henry J. Anderson (the "Supp.Anderson Cert."); and the Reply Memorandum in Support of Defendants' Motion for Summary Judgment (the "Reply").

In opposition to the Motion, Lynch has submitted: the Plaintiff's Legal Brief in Opposition to Defendants' Motion for Summary Judgment (the "Opposition"); the Plaintiff's Supplementary Legal Memorandum in Opposition to Defendants [sic] Motion for Summary Judgment (the "Supp. Opposition"); the Certification of Herbert Nadler (the "Nadler Cert."); the Certification of Paul Munter (the "Munter Cert."), and all exhibits attached thereto, including the 8 December 1986 letter from Buck to Daniel B. Stone, Esq., ("Stone"), counsel for Stevens ("the 8 December 1986 Buck Letter to Stone"), attached as Exhibit CCC; the Supplemental Certification of Paul Munter (the "Supp. Munter Cert."), and all exhibits attached thereto, including the 23 October 1986 letter from Stone to the IRS (the "23 October 1986 Stone Letter to IRS"), attached as Exhibit WW; the Certification of Henry J. Daaleman, Esq. (the "Daaleman Cert."), and all exhibits attached thereto; the Supplemental Certification of Henry J. Daaleman, Esq. (the "Supp. Daaleman Cert."), and all exhibits attached thereto; a volume of excerpted deposition transcripts; and the Certification of Joseph P. Lynch (the "Lynch Cert."), and all exhibits attached thereto, including the 11 January 1988 letter from Lynch to Linda Harris ("Harris"), Personnel Manager of Stevens (the "11 January 1988 Lynch Letter to Harris"), attached as Exhibit A, the 27 January 1988 letter from Harris to Lynch (the "27 January 1988 Harris Letter to Lynch"), attached as Exhibit B, and the charge of discrimination filed by Lynch with the Equal Employment Opportunity Commission (the "EEOC") (the "Charge of Discrimination"), attached as Exhibit D.

3. The Defendants previously filed a motion for summary judgment on 1 September 1989 which encompassed issues not addressed by the present Motion. *See* Defendants' Memorandum at 6. On 18 October 1989, Lynch cross-moved for summary judgment on all claims in the Complaint. *Id.* The submissions relative to the previous motions for summary judgment showed genuine issues of material fact. *Id.* The parties agreed at a 29 November 1989 status conference to withdraw their respective motions and to refrain thereafter from moving for summary judgment with respect to the sufficiency of the funding of the On–Going Plan subsequent

and because the restructuring of the Salaried Plan, the recapture of assets deemed surplus, the offering of the Window and the denial to Lynch of Window benefits did not as a matter of law violate ERISA or the ADEA, the Motion is granted.

*Facts*

Lynch was employed by Stevens on 1 April 1972 and was terminated on 15 January 1988 from a position as Administrative Manager for the International Division. Lynch Cert., ¶ 2. He was fifty-nine years old at the time of his discharge. *Id.*

### A. *The Stevens Salaried Plan*

Stevens established the Salaried Plan effective 1 January 1948. Defendants' Memorandum at 9; Opposition at 1. The Salaried Plan is a defined benefit pension plan for the benefit of eligible salaried employees. Defendants' Memorandum at 9; Opposition at 2. As such, the Salaried Plan provides fixed benefits to participants based on a benefit formula set forth in the Salaried Plan. *See* 1983 Plan at 10–25.[4] In general, pension benefits are calculated based on each participant's compensation and period of covered employment with Stevens. *Id.* Pension benefits accrue during each participant's period of covered employment and become vested, or nonforfeitable, after ten years of accrual (or after five years of accrual effective 1 January 1989), and are generally paid in monthly installments upon normal retirement at age 65 or upon early retirement at age 55. *Id.;* Anderson Cert., ¶ 14. The Salaried Plan provides that all accrued benefits become vested upon its termination. 1983 Plan at 44.

Stevens is the sole contributor to the Salaried Plan. 1983 Plan at 34; Retiree Plan at 34; On–Going Plan at 34; Complaint at 8. Contributions by Stevens are determined based on actuarial calculations of the amount necessary to fund the obligations of the Salaried Plan. *Id.* From 1948 to the present, actuarial services for the Salaried Plan have been provided by George B. Buck Consulting Actuaries, Inc. ("Buck"). Anderson Cert., ¶ 7. As actuary, Buck is responsible for estimating the present value of future benefits to be paid by the Salaried Plan and for calculating the yearly contribution by Stevens based on a funding method which allocates to the current year a portion of the difference between the present value of future benefits and the current value of assets. Anderson Cert., ¶ 4.

Because the Salaried Plan provides defined benefits to participants and because Stevens is its sole contributor, Stevens bears the risk of the Salaried Plan's actual investment experience relative to actuarial predictions. *Id.* at ¶ 16. If the actuarial predictions for investment returns are lower than actual experience in a given year, Stevens is then required to make larger contributions to the Salaried Plan in subsequent years. *Id.* If, on the other hand, actuarial predictions prove too high, Stevens is permitted to decrease its contributions in subsequent years. *Id.* The funding method for the Salaried Plan and its investment earnings affect only the amount Stevens is required to contribute to the Plan. *Id.*

Under the terms of the Salaried Plan, the Investment Committee of the Stevens' Board of Directors (the "Investment Committee") has the authority to make invest-

---

to the recapture, Lynch's termination from employment and the alleged failure by the Defendants to provide Lynch with information concerning the Window. *Id.* The Parties also agreed the Defendants would refile a motion for summary judgment addressing only the validity of the restructuring, recapture and the Window. *Id.;* 6 December 1989 Dermer Letter to the Court. The motion for summary judgment subsequently filed is the present Motion.

The Parties agree that issues relating to the legality of the termination of Lynch, the alleged

underfunding of the On–Going Plan and the alleged failure by the Defendants to furnish Lynch with information regarding the Window remain for future disposition. *See* Defendants' Memorandum at 30 n. 16; 6 December 1989 Dermer Letter to the Court; Lynch Cert. at 21.

4. Because the Salaried Plan in effect at the time of the restructuring and recapture was the Amended and Restated Plan, effective 1 January 1983 (the "1983 Plan"), citation is made to the 1983 Plan.

ment decisions for the Salaried Plan as "named fiduciary." 1983 Plan at 37; Retiree Plan at 37; On–Going Plan at 37. The Investment Committee is also responsible for implementing funding policies and methods of funding contributions of Stevens to the Salaried Plan so as to maintain the Salaried Plan on a sound actuarial basis and so as to meet the minimum funding standards of ERISA. *Id.*

The Salaried Plan also provides for the establishment of the Pension Committee by the Board of Directors to serve as "named fiduciary." 1983 Plan at 38–41; Retiree Plan at 38–41; On–Going Plan at 38–41. The Pension Committee has the authority under the Salaried Plan to administer the Salaried Plan in all respects with the exception of those functions ascribed to the Investment Committee, including the setting of interest rates to be used for actuarial calculations and the determination of eligibility for participation in the Salaried Plan. *Id.* The Salaried Plan provides the Pension Committee shall be entitled to rely on information furnished by the actuary (Buck), and states: "[A]ll actions so taken or permitted shall be conclusive upon all persons having or claiming to have any interest in or under the [Salaried] Plan." *Id.*

The Salaried Plan permits its modification or amendment if such modification or amendment does not deprive a participant of benefits to which the participant is entitled or make it possible for Salaried Plan assets to be used for purposes other than for the exclusive benefit of participants before plan liabilities have been satisfied. 1983 Plan at 42; Retiree Plan at 42; On–Going Plan at 42; Complaint at 9. The Salaried Plan also authorizes its merger and consolidation with other plans and the transfer of its assets to other plans if the benefits provided to a participant prior to such merger, consolidation or transfer are equal to or greater than "the benefit [the participant] would have been *entitled* to receive immediately before the merger, consolidation, or transfer if the Plan had then terminated." 1983 Plan at 42–43; Retiree Plan at 42–43; On–Going Plan at 42–43 (emphasis added).

The Salaried Plan contains an "exclusive benefit" provision, which provides:

[E]xcept as otherwise hereinafter provided, no part of the corpus or income of the funds shall be used for, or diverted to, purposes other than for the exclusive benefit of Members ... prior to the satisfaction of all liabilities....

1983 Plan at 35–36; Retiree Plan at 35–36; On–Going Plan at 35–36. Finally, the Salaried Plan permits its termination and provides that upon termination, "any funds not required to satisfy all liabilities of the Plan for benefits because of erroneous actual computation *or otherwise* shall be returned to [Stevens]." 1983 Plan at 44; Retiree Plan at 44; On–Going Plan at 44 (emphasis added).

B. *Salaried Plan Management Prior to the Restructuring*

In order to increase investment returns, the Investment Committee approved an investment management structure in 1981 whereby all assets of the Salaried Plan and other Stevens retirement plans were placed in a master trust (the "Master Trust"). Zerrenner Dep. at 26; Investment Manager Restructure at 1. The Northern Trust Company ("Northern Trust") was appointed trustee of the Master Trust effective 1 October 1981. *See* Master Trust; Holt Cert., ¶ 1; Opposition at 1.

The Master Trust consisted of a single commingled fund in which a number of participating retirement plans of Stevens were deemed to have proportionate interests. Master Trust at 2–1; Holt Cert., ¶ 2. The retirement plans which were included in the Master Trust were the Salaried Plan, the Hourly Employees' Salaried Plan of J.P. Stevens & Co., Inc. (the "Hourly Plan") and other plans for the salaried and hourly employees of the Stevens subsidiaries Foote & Davies, Inc. and Ruralist Press, Inc. (the "Subsidiary Plans"). *Id.*

Northern Trust determined the respective shares of Master Trust assets pertaining to the various retirement plans as of 1 October 1981. The determinations of the shares pertaining to the Subsidiary Plans were based on the value of the investment portfolio and contract value for each plan

as determined by Northern Trust as of the day preceding the creation of the Master Trust. With respect to the Salaried and Hourly Plans, the determination of their shares was based on the value of the Salaried Plan portfolio as determined by Morgan Guaranty Trust Company ("Morgan"), the previous trustee for the Salaried Plan, and the value of the Hourly Plan portfolio as determined by the Equitable Life Assurance Society of America ("Equitable"), the previous trustee for the Hourly Plan. Holt Cert., ¶ 4, 6. The initial percentages of total Master Trust interests were reallocated quarterly to the respective retirement plans to reflect interim contributions on behalf of each retirement plan. Holt Cert., ¶ 8. Aside from the initial valuations performed by Morgan and Equitable, Northern Trust determined the value of the Master Trust. Holt Cert., ¶ 11.

Under the terms of the Master Trust, responsibility for day-to-day investment decisions was held by the Operating Investment Committee, an adjunct to the Investment Committee, and by investment managers, or outside investment firms with expertise in various types of investments. *See* Investment Manager Restructure; Zerrenner Dep. at 21, 26; Opposition at 2. In addition, Northern Trust had discretion to invest certain assets. Master Trust, Arts. VII–VIII. Investments made following the creation of the Master Trust included the purchase of Stevens stock. Zerrenner Dep. at 57–58.

## C. *Plan Restructuring and Reversion*

Stevens became aware in 1982 that the Salaried Plan was substantially overfunded. Zerrenner Dep. at 49–50; 17 August 1982 Zerrenner Memo. to W. Stevens et al. The overfunding was caused by higher than expected yields on Salaried Plan investments and by a contribution level by Stevens which had been based on conservative actuarial methods and assumptions. Zerrenner Dep. at 86; Restructuring Proposal at 1.

In order to attempt to decrease the amount of the surplus, the actuarial assumption for interest rates was gradually increased in 1983 from seven percent to nine percent, with a corresponding increase in the assumption for future pay liability. Zerrenner Dep. at 63; Defendants' Memorandum at 16.[5] In addition, the funding method was changed from the aggregate method, the most conservative funding method, to the projected unit method, the least conservative method. Zerrenner Dep. at 64–66; 17 August 1982 Zerrenner Memo. to W. Stevens et al.[6] Under the projected unit method, future pay increases were carried as a liability by Stevens. Zerrenner Dep. at 66. These changes in actuarial methods decreased contributions by Stevens to the Salaried Plan for 1983 and 1984. Zerrenner Dep. at 121. The changes, however, had no effect on the level of benefits to be distributed under the Salaried Plan as a defined benefits plan. Anderson Cert., ¶ 16; Zerrenner Dep. at 67.

Because the Salaried Plan continued to be overfunded in spite of these changes, the Stevens Board of Directors began consideration toward the end of 1983 of a proposal to restructure the Salaried Plan so as to recapture excess assets. Zerrenner Dep. at 105–06. On 17 April 1984, a formal proposal was submitted to the Board of Directors to restructure the Salaried Plan. Zerrenner Dep. at 106; Restructuring Proposal.[7] On the same date, the Stevens Board of Directors adopted a resolution providing for the restructuring of the Sala-

---

**5.** No change in the actuarial methods for funding the Hourly Plan was considered because the Hourly Plan was underfunded in 1982. 17 August 1982 Zerrenner Memo. to W. Stevens et al.

**6.** Under the aggregate method, contribution requirements are computed by taking into account future benefits based on the life expectancy of participants. In contrast, the projected unit credit method limits funding to the benefits accrued to date. If the accrued benefit level exceeds plan assets, the deficiency becomes an unfunded liability which may be funded over 30 years. *Id.*

**7.** The Restructuring Proposal stated: "[A]t present, the excess assets do not directly benefit the company or its shareowners. We believe they represent funds which management may have an obligation to use, if they are, indeed, available." *See* Restructuring Proposal.

ried Plan and for the recapture of excess assets by Stevens (the "17 April 1984 Board Resolution"). 17 April 1984 Board Minutes; Zerrenner Dep. at 106.

The 17 April 1984 Board Resolution provided for the division of the Salaried Plan into two plans, one for active employees (the On–Going Plan) and one for retired employees (the Retiree Plan). 17 April 1984 Board Minutes. It also provided for the allocation of assets needed to fund obligations of the On–Going Plan to that Plan and for the allocation of all remaining assets to the Retiree Plan. *Id.* It then provided for the termination of the Retiree Plan upon the purchase of lifetime annuities for Retiree Plan participants. It further stated: "All active employees shall be fully vested in their benefits accrued as of June 1, 1984." *Id.* It provided for the subsequent recapture of assets remaining in the Retiree Plan after the purchase of the annuities. *Id.* Finally, it provided for an increase in benefits, including a two percent increase in benefits under the Retiree Plan for each full year of retirement commencing 1 April 1980 and a special contribution to the savings plans of On–Going Plan participants of 2% of gross pay for three years. *Id.* It conditioned its implementation on successful accomplishment of the restructuring of the Salaried Plan and authorized the Executive Committee of the Board of Directors to set the implementation date. *Id.*

The Executive Committee of the Board of Directors adopted a resolution on 21 May 1984 (the "21 May 1984 Board Resolution") which made the termination of the Retiree Plan effective 1 July 1984 and which provided: "[A]ll active employees shall be fully vested in their benefits accrued as of July 1, 1984 under the [Salaried] Plan as referred to in the Resolutions." *See* 21 May 1984 Executive Committee Resolution.

Stevens publicized its plan for the restructuring and reversion with Salaried Plan participants prior to and upon completion of its implementation. Stevens issued a press release on 17 April 1984 announcing its plan to restructure the Salaried Plan

into two plans and to recover more than $50 million in excess assets following the restructuring. *See* Press Release. On 18 May 1984, Stevens circulated a letter to Salaried Plan participants, informing them:

Stevens intends to divide the current plan into two plans—one for retired employees and one for our active employees.... After the necessary regulatory agencies are notified ... and more than enough money is set aside to meet all of the current pension commitments, there will be substantial excess assets that [Stevens] can use to help achieve its long-range goals.

18 May 1984 Stevens Letters to Participants. Finally, Stevens printed a Notice to Interested Parties, which counsel for Stevens states was sent to Salaried Plan participants, stating:

This plan is going to be amended and split into two plans: One for active employees ... and one for retired employees.... The plan for retired employees will then be technically "terminated." This technical "termination" will have no effect on the payment of benefits. A Notice of Intent to Terminate will be filed with the [PBGC] on April 9, 1984 and the proposed date of termination is May 1, 1984. The Plan Administrator believes that the plan assets under the retired employees plan will be adequate to provide for all vested benefits for participants under the plan.

Notice to Interested Parties; Defendants' Memorandum at 23–24.

Northern Trust purchased annuities to cover the benefit obligations of the Retiree and On–Going Plans with respect to benefits accrued as of 1 July 1984 by making a one-time payment of $124.9 million to the Mutual Life Insurance Company of New York ("MONY"). Hardy Cert., ¶ 4; Anderson Cert., ¶ 10. The annuity contracts unconditionally and irrevocably guaranteed payment by MONY of benefits accrued through 1 July 1984. Hardy Cert., ¶¶ 2–3; Anderson Cert., ¶ 10. In addition, the annuity contracts guaranteed payment of early retirement benefits for employees who met the age (fifty-five years old) and

service requirements for eligibility as of 30 June 1984. Hardy Cert., ¶ 8; Anderson Cert., ¶ 21.

Participants in the On–Going Plan, including Lynch, were issued certificates reflecting the amount of benefits accrued through 30 June 1984 and payable on retirement. Hardy Cert., ¶ 7. Because Lynch had met the eligibility requirements for early retirement benefits as of 30 June 1984, the annuity contract for the On–Going Plan guaranteed him payment of normal retirement benefits of $412.39 a month or an early retirement benefit, depending on his date of retirement. *Id.*; Deferred Annuitant Certificate.

Northern Trust purchased "participating" annuity contracts for both the On–Going and Retiree Plans, whereby it paid to MONY an additional $8.6 million above a designated "trigger point" from which it was entitled to withdraw funds. Hardy Cert., ¶¶ 2–3, 4, 6; Anderson Cert., ¶ 25. The participating annuity contracts permitted Northern Trust to participate in investment gains as long as aggregate funds did not decline below the trigger point. Hardy Cert., ¶ 5. If the value of the assets fell below the trigger point, the contract automatically converted to a traditional, nonparticipating annuity. *Id.*; Anderson Cert., ¶ 25.

On 1 June 1984, Stevens sought the approval of the IRS for the division of the Salaried Plan into the Retiree Plan and the On–Going Plan by filing a Form 5310 Notice of Transfer of Assets and Liabilities. 1 June 1984 Stevens Letter to IRS. Stevens advised the IRS the division of the Salaried Plan would take place on 1 July 1984, and indicated 1 July 1984 where Form 5310 requested the "date of merger, consolidation or transfer." *Id.*

Stevens also wrote to the PBGC on 19 June 1984 to advise it Stevens was dividing its Salaried Plan into a plan for active employees (the On–Going Plan) and a plan for retirees (the Retiree Plan) effective 1 July 1984. 19 June 1984 Notice to PBGC. Stevens further advised the PBGC it was dividing up current Salaried Plan assets between the two plans in sufficient amounts to cover benefits under the two plans. It stated that also effective 1 July 1984 it was terminating the Retiree Plan and recapturing from it excess assets. *Id.* It stated benefits accrued as of 1 July 1984 under the On–Going Plan would become vested, and those benefits as well as benefits under the Retiree Plan would be annuitized. *Id.*

Because all assets of the various Stevens retirement plans were commingled under the Master Trust, Northern Trust segregated Salaried Plan assets in a separate account within the Master Trust (the "Salaried Plan Account") in April 1985 to facilitate the restructuring. Holt Cert., ¶¶ 14, 15.

On 25 April 1985, the PBGC issued a Notice of Sufficiency to Stevens advising Stevens it had determined Salaried Plan assets were sufficient "as of [the] proposed date of distribution to discharge when due all obligations of the [Salaried] Plan with respect to guaranteed benefits." *See* Notice of Sufficiency. The PBGC designated as the date of termination 1 July 1984. *Id.* Also on 25 April 1985, the PBGC approved use by Stevens of participating annuity contracts to cover Retiree and On–Going Plan liabilities accrued through 30 June 1984. 25 April 1985 PBGC Letter to Stevens.

On 25 June 1985, the IRS notified Stevens it had determined termination of the Retiree Plan did not adversely affect qualification of the Retiree Plan for tax-exempt status. *See* 25 June 1985 IRS Letter to Stevens. The IRS further advised Stevens it was required to continue filing the Form 5500 for the Retiree Plan until all Retiree Plan assets were distributed. *Id.*

The restructuring of the Salaried Plan into two plans and the subsequent termination of the Retirees Plan (the "spinoff and termination") was implemented in June 1985 after all the requisite agency approvals were received. Anderson Cert., ¶ 18. Stevens recaptured approximately $112 million in excess assets on 27 June 1985. *See* 26 June 1985 Northern Trust Letter to Stevens. Northern Trust distributed the excess assets to Stevens in cash and Ste-

vens stock. Holt Cert., ¶ 17. In addition, Northern Trust established two new accounts in the Master Trust, one for the Retiree Plan (the "Retiree Plan Account") and the other for the On–Going Plan (the "On–Going Plan Account"). Holt Cert., ¶ 16. Assets from the Salaried Plan account were distributed pro rata to those two accounts. *Id.*

On 27 June 1985, Stevens issued letters to Salaried Plan participants informing them the restructuring and recapture of assets was approved by the PBGC. *See* 27 June 1985 Stevens Letters to Participants. The letters also informed Salaried Plan participants some recaptured assets would be used to increase their benefits and the payment of such increases would commence in August 1985. *Id.*

Because the spin-off and termination were effective 1 July 1984, "the status of benefits [under the On–Going Plan accrued through 1 July 1984] was 'frozen' as of that date and the respective rights and obligations determined accordingly." Anderson Cert., ¶ 18. The annuity contract purchased for the On–Going Plan satisfied liabilities accrued as of 30 June 1984. Benefits under the On–Going Plan, including early retirement benefits for employees who retired after 1 July 1984, began to accrue only as of 1 July 1984. Anderson Cert., ¶¶ 10, 12, 20–21. The On–Going Plan carried future liability in the amount of $29 million following the reversion. Zerrenner Dep. at 319.

Because the Retiree Plan was terminated effective 1 July 1984, it did not accrue any benefits or accept any members after that date. Anderson Cert., ¶ 20. Stevens continues to file annually a Form 5500 with the IRS for the Retiree Plan pursuant to IRS instructions because it has not distributed all benefits payable under the Retiree Plan. Anderson Cert., ¶ 23; 25 June 1985 IRS letter to Stevens.

Stevens issued plan documents for the Retiree Plan and for the On–Going Plan. Defendants' Memorandum at 18. The plan documents for the On–Going Plan give its effective date as 1 July 1984 and describe it as "a continuation, revision and modifica-tion of the Plan first effective January 1, 1948." On–Going Plan at 1. They further state:

> As of July 1, 1984, the former Plan was split into two plans, (1) the Retired Employees Retirement Salaried Plan of J.P. Stevens & Co., Inc. and Subsidiaries, designed to cover all Members under the former Plan who were retired as of June 30, 1984, and (2) this Plan, designed to cover all other Members of the former Plan.

*Id.* at 1.

The plan documents for the Retiree Plan also give its effective date as 1 July 1984. Retiree Plan at 1. The Retiree Plan provides:

> As of July 1, 1984, the former Plan was split into two plans, (1) this Plan, designed to cover all Members under the former Plan who were retired as of June 30, 1984, and (2) the Retirement Salaried Plan of J.P. Stevens & Co., Inc. and Subsidiaries, designed to cover all other Members of the former Plan. This Plan shall be frozen and admit no new members and shall exist only to pay out benefits to its Members as of July 1, 1984.

*Id.* at 1.

D. *The Window*

Beginning in 1983, Stevens attempted to increase its profitability by abandoning less profitable areas of its business. Durst Cert., ¶ 6. Stevens closed several of its plants in 1984 and 1985. Durst Cert., ¶ 7. With these divestitures, Stevens decreased in size by approximately forty percent. Durst Cert., ¶ 8. Corporate staff, *i.e.,* staff who serviced the company as a whole, were not affected by the divestitures. Durst Cert., ¶¶ 8, 17. Senior managers therefore agreed at a February 1986 meeting to make a reduction in corporate staff proportionate to the non-corporate reductions resulting from the 1984 and 1985 divestitures by using a voluntary retirement incentive (the Window). Durst Cert., ¶ 9.

A follow-up meeting was held in March 1986 to discuss general eligibility criteria for the Window. Durst Cert., ¶ 9. The management staff present discussed limit-

ing the Window to employees earning less than $65,000 and offering the Window on a company-wide basis. Durst Cert., ¶ 14–15. A company-wide Window was ruled out because it carried the risk that senior managers in the merchandising and sales departments would retire and because it was specifically corporate employees who were providing services no longer required in light of the newly-reduced size of Stevens. Durst Cert., ¶ 15; Zerrenner Dep. at 170–71.

Corporate staff were identified using a functional approach whereby staff were deemed corporate if they performed services for Stevens as a whole. Durst Cert., ¶ 17; Zerrenner Dep. at 176. Thus, certain presidents of divisions who were performing corporate services at the time the Window was offered were deemed eligible, including Irwin Gusman and W.W. Stasney. *Id.* In addition, because it was decided to offer the Window to all corporate employees who met the age guidelines, offerees included some corporate employees who were not performing surplus functions. Zerrenner Dep. at 177–78.

Members of the International Division, of which Lynch was a member, were not offered the Window. The International Division was regarded not as a corporate area but as a division, in that its financial results were reported individually, it submitted its own profit and loss reports and it had its own division president. *Id.* The divisions of Stevens were held individually accountable for their financial results and division presidents were responsible for cost-cutting decisions, including the decision to terminate staff. Durst Cert., ¶ 18; Zerrenner Dep. at 171. The unprofitability of the divisions or their need to reduce staff were not considered in devising eligibility criteria for the Window. *Id.*

By April 1986, it was determined the Window would be offered to all staff designated as "corporate" who were eligible for retirement. Durst Cert., ¶ 21. It was decided that corporate employees who would be required to retire in 1986 in any event because of their age, including Paul Nipper, would be included, and it was decided

not to impose a salary limit on eligible corporate staff. *Id.* A "five plus five" program with an eligible age of fifty years old was agreed to, whereby each participant would receive an additional five years of credited service and age under the pension benefits formula of the On–Going Plan. *Id.* In addition, participants between the ages of 59 and 62 would receive an additional $500 a month under the Window. *Id.*

The Stevens Board of Directors gave its authorization for the Window at a 15 May 1986 meeting. Durst Cert., ¶ 22. The Stevens Board of Directors ratified the Window as an amendment to the On–Going Plan by unanimous written consent on 21 January 1987. Durst Cert., ¶ 24; 21 January 1987 Board Resolution. The 21 January 1987 Board Resolution made the Window amendment effective 19 May 1986. 21 January 1987 Board Resolution.

On 19 May 1986, after receiving authorization for the Window by the Board of Directors, Stevens sent a letter announcing the Window to eligible corporate staff along with an election form. *See* 19 May 1986, Stevens Letter to Window Offerees. The letter stated the Window was available to corporate employees aged 50 by year-end and older with at least one year of service who decided between 19 May 1986, when the letter was issued; and 30 June 1986 to retire. *Id.* The letter described the Window benefits, and stated:

> If you elect to take early retirement during the Window period, your most likely retirement date will be August 1, 1986.... If you elect to retire as of August 1, 1986, the Company may request that you stay for a few months to complete special assignments. However, there will be very few of these exceptions and only with the approval of the Chairman's office.

*Id.*

In addition, eligible corporate employees received a list of informational questions and answers (the "Questions and Answers") as further explanation of the Window. Durst Cert., ¶ 27. The Questions and Answers stated only active corporate

employees were eligible for the Window. *See* Questions and Answers. It also stated a few corporate employees in key positions who elected the Window may be held by management for critical business needs beyond 31 July 1986, the date set for retirement under the Window. *Id.* The Questions and Answers advised Window offerees: "[I]t is not anticipated that this program will ever be offered again...." *Id.* It also informed the offerees they were not permitted to sign up for the Window after the 30 June 1986 deadline. *Id.*

In the end, seventy-seven corporate employees out of approximately two hundred and twenty offerees elected the Window. Durst Cert., ¶ 29; Defendants' Memorandum at 28. Stevens retained fifteen to twenty Window participants beyond the 1 August 1986 designated retirement date in order to complete work in progress. Durst Cert., ¶ 31. Given the number of acceptances, Buck determined the value of benefits under the Window to be $2,526,603. Durst Cert., ¶ 30.

Lynch was terminated on 15 January 1988 from his position at Stevens as Administrative Manager for the International Division. Lynch Cert., ¶ 2. Lynch's supervisor told him on 5 January 1988 that although he received a $10,000 job performance bonus during 1987, Stevens eliminated his job. *Id.*

On 11 January 1988, apparently after being notified of his pension benefits, Lynch wrote to Linda Harris ("Harris"), the personnel manager of Stevens, to express disappointment at not receiving Window benefits and to request consideration for the benefits. 11 January 1988 Lynch Letter to Harris. Harris responded to Lynch on 27 January 1988 to advise him he would not be offered the Window because the Window had been offered to corporate employees only for retirements which occurred prior to 30 June 1986. 27 January 1988 Harris Letter to Lynch. In addition, the Pension Committee considered the request of Lynch and determined on 9 March 1988 to deny him Window benefits because he was ineligible when the benefits were originally offered and because he had not

elected to retire by 1 July 1986, the date the Window period expired. Durst Cert., ¶ 32; 9 March 1988 Salaried Committee Minutes.

On 29 January 1988, Lynch filed the Charge of Discrimination with the EEOC. *See* Charge of Discrimination. He stated in the Charge of Discrimination:

> I have been denied the opportunity of accepting [the Stevens] Early Retirement Package extended to corporate employees, and my position has been terminated effective January 15, 1988. The respondent based its denial of early retirement on my alleged non-corporate status. I believe I have been discriminated against because of my age (59½) in violation of the Federal Age Discrimination in Employment Act of 1967, as amended.

*Id.* Lynch states the "EEOC did not make any findings" with respect to his Charge of Discrimination. Lynch Answers to Interrogatories at 2.

In support of their Motion, as it relates to the restructuring of the Salaried Plan and the recapture of assets deemed surplus, the Defendants argue the restructuring and recapture were effected in accordance with the provisions of the Salaried Plan and of ERISA. They further argue the recapture was legal because all accrued benefits through the effective date of the restructuring had been met by the purchase of the annuities.

In opposition to the Motion, Lynch asserts the restructuring and recapture of excess assets violated ERISA because Lynch was not given adequate notice of the restructuring prior to its implementation. Lynch also contends the restructuring and reversion violated ERISA because Salaried Plan liabilities in the form of benefits for future service, early retirement benefits, the increase in benefits approved by the Board of Directors when they approved the restructuring and reversion, and benefits accrued through the date of actual implementation of the restructuring were not satisfied by the annuities. Lynch further contends the recapture constituted the use of Salaried Plan assets for purposes other than for the exclusive benefit of partici-

pants in violation of the "exclusive benefit rule" of ERISA, 29 U.S.C. § 1103(c). Finally, Lynch contends the implementation of the restructuring and reversion constituted a breach of the fiduciary duties of the Defendants under ERISA.

In support of their Motion, as it relates to the Window, the Defendants argue the Window does not violate the ADEA because while it makes distinctions based on age, it is exempted from challenge under the ADEA by 29 U.S.C. § 623(f)(2) as a bona fide benefits plan. The Defendants also assert Lynch was denied Window benefits because he was not eligible under the terms of the Window as an employee of the International Division and because he missed the application deadline for Window benefits.

In opposition to the Motion as it relates to the Window, Lynch variously argues the Window is not a bona fide pension plan within the meaning of § 623(f)(2) because it discriminates against employees who are not senior management employees and because it was targeted against employees over the age of fifty, or employees in the class protected by the ADEA. He also challenges the bona fides of the Window on the ground that several high level non-corporate area managers were offered the Window and permitted to work past the retirement date mandated under the Window as exceptions to its terms. With respect to the denial to him of Window benefits, Lynch asserts he should have been offered Window benefits because he was eligible as a corporate area employee.

### Discussion

To prevail on a motion for summary judgment, the moving party must establish "there is no genuine issue as to any material fact and that [it] is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The district court's task is to determine whether disputed issues of fact exist, but the court cannot resolve factual disputes in a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986). All evidence submitted must be viewed in a light most favorable to the party opposing the motion. *See Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). *See also Todaro v. Bowman*, 872 F.2d 43, 46 (3d Cir.1989); *Joseph v. Hess Oil*, 867 F.2d 179, 182 (3d Cir.1989).

Although the summary judgment hurdle is a difficult one to overcome, it is by no means insurmountable. As the Supreme Court has stated, once the party seeking summary judgment has pointed out to the court the absence of a fact issue,

> its opponent must do more than simply show that there is some metaphysical doubt as to the material facts.... In the language of the Rule, the non-moving party must come forward with 'specific facts showing that there is a *genuine issue for trial.*' ... Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'

*Matsushita*, 475 U.S. at 586–87, 106 S.Ct. at 1356 (emphasis in original, citations and footnotes omitted).

The court elaborated on the standard in *Anderson:* "If the evidence [submitted by a party opposing summary judgment] is merely colorable ... or is not significantly probative ... summary judgment may be granted." 477 U.S. at 249–50, 106 S.Ct. at 2511 (citations omitted). The Supreme Court went on to note in *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986): "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and we think it should be interpreted in a way that allows it to accomplish this purpose." *Id.* at 323–24, 106 S.Ct. at 2553 (footnote omitted). Thus, once a case has been made in support of summary judgment, the party opposing the motion has the affirmative burden of coming forward with *specific* facts evidencing the need for trial. *See* Fed.R.Civ.P. 56(e). *See also Aronow Roofing Co. v. Gilbane Bldg. Co.*, 902 F.2d 1127, 1128 (3d Cir.1990) ("summary judgment will be granted where the non-moving party fails

to 'establish the existence' of an element essential to the case.").

A. *The Restructuring and Reversion*

1. *Basis for Remedy Claimed by Lynch*

Lynch contends a common law right of action for equitable restitution exists under ERISA and entitles him to demand restoration of the reversion to the On–Going Plan. Opposition at 66–68 (citing, among other cases, *Plucinski v. I.A.M. Nat. Pension Fund*, 875 F.2d 1052, 1056–58 (3d Cir.1989); *Carl Colteryahn Dairy, Inc. v. Western Pennsylvania Teamsters & Employers Pension Fund*, 847 F.2d 113, 120–22 (3d Cir.1988), *cert. denied*, 488 U.S. 1041, 109 S.Ct. 865, 102 L.Ed.2d 989 (1989); *Van Orman v. American Ins. Co.*, 680 F.2d 301, 311–314 (3d Cir.1982); *Murphy v. Heppenstall Co.*, 635 F.2d 233, 237–39 (3d Cir. 1980), *cert. denied*, 454 U.S. 1142, 102 S.Ct. 999, 71 L.Ed.2d 293 (1982)). Lynch then argues:

> Stevens should, therefore be, ordered to restore its illegal profits plus a 9 percent (9%) assumed investment rate of return on top of such restored figure since such figure was used as an actuarial assumption. This equitable restitution, however, only provides for restoration of ill-gotten gains and the disgorgement of such profits. The Court should also fashion a remedy of punitive damages in order to discourage such wrongdoing in the future and serve as a lesson to deter future fiduciary breaches.

Opposition at 66–67.

Lynch does not state in his complaint that he seeks the equitable restitution of the reversion to the On–Going Plan. He states he seeks injunctive relief "that [Stevens] salaried employees pension plan be fully funded," Complaint at 15–16, apparently seeking payment by Stevens of alleged delinquencies. The claim for equitable restitution of the reversion is not within the parameters of the Complaint and is therefore not before this court for decision. However, even if Lynch had presented this claim in the Complaint, he would not be entitled to equitable restitution.[8]

ERISA is a "comprehensive and reticulated statute" adopted by Congress after careful study of private retirement pension plans. *Alessi v. Raybestos–Manhattan, Inc.*, 451 U.S. 504, 510, 101 S.Ct. 1895, 1899, 68 L.Ed.2d 402 (1981) (quoting *Nachman Corp. v. Pension Benefit Guaranty Corp.*, 446 U.S. 359, 361, 100 S.Ct. 1723, 64 L.Ed.2d 354 (1980)). Therefore, "[w]here Congress has established an extensive regulatory network and has expressly announced its intention to occupy the field, federal courts will not lightly create additional rights under the rubric of federal, common law." *Van Orman*, 680 F.2d at 312.

The courts in the cases cited by Lynch found common law rights of action under ERISA only after determining that the plaintiff's claim was based on a violation of law by the defendant or on a right of the plaintiff provided by law or contract and that such a right of action would not be inconsistent with ERISA. *See, e.g., Plucinski*, 875 F.2d at 1056 (finding common law right of action by employer to equitable restitution of contributions made because of mistake of fact or law, finding that 29 U.S.C. § 1103(c) permitted the return to the employer of contributions mistakenly made); *Carl Colteryahn Dairy*, 847 F.2d at 118–19 (following merger of two plans and subsequent withdrawal by one, court found common law right existed for withdrawing plan to recover withdrawal penalty against second plan because second plan fraudulently represented prior to the merger it was adequately funded); *Van Orman*, 680 F.2d at 313 (finding no common law right of action for plan participants to recoup share of surplus assets attributable to their contributions prior to plan termination, finding ERISA, 29 U.S.C. § 1344(d)(2), and pension agreement provided only for post-termination distribution surplus); *Murphy*, 635 F.2d at 237 (finding common law right of action for employees to recover difference between benefits guaranteed by PBGC and benefits promised by collective bargaining agreement).

---

**8.** For other instances in which the submissions of Lynch contain claims not contained in the Complaint, *see infra* at 1000, 1001, 1003, 1005, 1008, 1009, 1010, 1011, 1012 and 1013.

In the instant case, Lynch does not allege he is entitled to demand restoration of the reversion based on a right provided by law or contract. Rather, his claim is based on his assertion of illegal activity by the Defendants. Lynch may not, therefore, demand the equitable restitution of the reversion if the conduct of the Defendants was not illegal as a matter of law. As will be explained, Lynch has not shown the conduct of the Defendants was illegal.

Lynch also seems to rely on section 1109 of Title 29 [9] as a basis for demanding restoration of assets recaptured by Stevens to the On–Going Plan. Lynch quotes section 1109, and then states: "Lynch submits that Stevens, through its Board of Directors, who acted as the investment fiduciary for the Stevens Salaried Employee Pension Plan, is liable to restore the profits which have been made through the abuse of its fiduciary duties." Opposition at 65. *See also* Complaint at 14. As will be discussed, Lynch has not shown the Defendants breached their fiduciary duties to Salaried Plan participants.

The above referenced contentions of Lynch are but a few general examples of why it is so difficult to understand just what conduct of the Defendants with respect to the restructuring and reversion or with respect to the management of the Salaried Plan Lynch alleges was illegal and how such conduct was illegal. Nevertheless, each assertion which appears to constitute an allegation of illegal activity is considered in turn.

### 2. The Restructuring and Reversion— ERISA's Exclusive Benefit Rule and Provisions on Fiduciary Duties

Lynch appears to contend the restructuring and reversion violated ERISA's exclusive benefit rule and the provisions governing fiduciary duties because they benefitted the company and because Durst participated in their implementation under a conflict of interest.[10]

### a. Benefits Protected Under ERISA

The purpose of ERISA is to ensure pension plan participants "actually receive

---

**9.** Section 1109 provides in relevant part:
(a) Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through the use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.
29 U.S.C. § 1109(a).

**10.** Lynch does not specify which ERISA provisions he claims were violated. Rather, he states only a general ERISA claim by asserting his action is "brought pursuant to the Employee Retirement income Security Act of 1974 (ERISA), 29 U.S.C.A. Sections 1001 to 1461." Complaint at 8. Supporting the characterization of his claims as asserting violations of the exclusive benefit rule and breaches of the fiduciary duties of the Defendants are the following allegations within his Complaint:
In 1984 and 1985, the Defendant corporation conspired to reduce its pension costs drastically and to use the pension funds for corporate purposes for its working capital including the purchase of treasury stock.
Complaint at 3.

Defendant Durst and the Defendant Pension Committee [sic] have breached their fiduciary duty, both statutory and common law, to administer the pension plan prudently, fairly and equitably to all members because of their conflict of interest with the Defendant corporation's corporate need to reduce cost, employees and obtain working capital at the expense of the financial integrity of the pension plan.
Complaint at 8.
In 1985, Defendant corporation restructured its pension plan for the salaried employees through a spin-off termination program, and the company improperly recovered $112 million of excess assets from the salaried plan.
Complaint at 11.
The Defendant corporation, Defendant Thomas C. Durst, and the Pension Committee have conspired to abuse the company salaried Employee Pension Program and their fiduciary duty toward the pension plan by using such pension plan to fund the Defendant corporation's working capital requirements at the expense of the members of the pension plan....
[T]he recapture of so called excess pension plan funds has been done at the expense of the employment interest of older employees.
Complaint at 14.

benefits and do not lose benefits as a result of unduly restrictive forfeiture provisions or failure of the pension plan to retain sufficient funds to meet its obligations." *Wright v. Nimmons*, 641 F.Supp. 1391, 1406 (S.D.Tex.1986) (quoting 1974 U.S.Code Cong. & Admin.News 4676–77)). ERISA is intended to protect only benefits which a participant has been promised and for which the conditions of eligibility have been met. *Alessi*, 451 U.S. at 510, 101 S.Ct. at 1899.

ERISA renders only accrued vested benefits nonforfeitable. 29 U.S.C. § 1053(a);[11] *Alessi*, 451 U.S. at 511, 101 S.Ct. at 1900. Accrued benefits are defined in ERISA as a participant's right to a retirement benefit "determined under the plan ... expressed in the form of an annual benefit commencing at normal retirement age." 29 U.S.C. § 1002(23)(A). Accordingly, accrued benefits are comprised of the interest in a retirement benefit a participant earns each year, as calculated by the formula specified by the plan. *Hoover v. Cumberland, Ma-*

*ryland Area Teamsters Pension Fund,* 756 F.2d 977, 981–82 (3d Cir.), *cert. denied,* 474 U.S. 845, 106 S.Ct. 135, 88 L.Ed.2d 111 (1985). "Normal retirement age" is defined in ERISA as the date so specified by the plan or the later of either the attainment of age 65 or 10 years participation in the plan. 29 U.S.C. § 1002(24).

b. *Plan Terminations Under ERISA and ERISA's Exclusive Benefit Rule and Fiduciary Duty Provisions*

A single employer plan may be terminated pursuant to section 1341. 29 U.S.C. § 1341.[12] Section 1344 governs the allocation of plan assets upon termination of the plan. 29 U.S.C. § 1344. Section 1344(a) contains an ordering provision which prioritizes the parties to whom the assets must be distributed. 29 U.S.C. § 1344(a).

Upon plan termination, section 1344(d)(1) permits an employer to recoup surplus assets[13] remaining after the liabilities to par-

---

**11.** Section 1053 provides in relevant part:

**a) Nonforfeitability requirements**

Each pension plan shall provide that an employee's right to his normal retirement benefit is nonforfeitable upon the attainment of normal retirement age and in addition shall satisfy the requirements of paragraphs (1) and (2) of this subsection.

(1) A plan satisfies the requirements of this paragraph if an employee's rights in his accrued benefit derived from his own contributions are nonforfeitable.

(2) A plan satisfies the requirements of this paragraph if it satisfies the requirements of (A), (B) or (C).

(A) A plan satisfies the requirements of this subparagraph if an employee who has at least 10 years of service has a nonforfeitable right to 100 percent of his accrued benefit derived from employer contributions.

(B) A plan satisfies the requirements of this subparagraph if an employee who has completed at least 5 years of service has a nonforfeitable right to a percentage of his accrued benefit derived from employer contributions

....

(C) A plan satisfies the requirements of this subparagraph if a participant who is not separated from the service, who has completed at least 5 years of service, and with respect to whom the sum of his age and years of service equals or exceeds 45, has a nonforfeitable right to a percentage of his accrued benefit derived from employer contributions

....

29 U.S.C. § 1053(a) (1985).

**12.** Section 1341 provides in relevant part:

**(a) Filing of notice that plan is to be terminated**

Before the effective date of the termination of a single-employer plan, the plan administrator shall file a notice with the corporation that the plan is to be terminated on a proposed date (which may not be earlier than 10 days after the filing of the notice), and for a period of 90 days after the proposed termination date the plan administrator shall pay no amount pursuant to the termination procedure of the plan unless, before the expiration of such period, he receives a *notice of sufficiency* under subsection (b) of this section. Upon receiving such a notice, the plan administrator may proceed with the termination of the plan in a manner consistent with this subtitle.

**(b) Notice of sufficiency**

If the corporation determines that, after application of section 1344 of this title, the assets held under the plan are sufficient to discharge when due all obligations of the plan with respect to basic benefits, it shall notify the plan administrator of such determination as soon as practicable.

28 U.S.C. § 1341 (1985).

**13.** Surplus assets are defined by regulation of the PBGC as "the plan assets remaining after all liabilities of the plan to participants and their

ties listed in section 1344(a) have been met, if the recapture does not contravene any provision of law and if the plan permits the recapture of surplus assets. 29 U.S.C. § 1344(d)(1).[14] *See also Blessitt v. Retirement Plan for Employees of Dixie Engine Co.*, 848 F.2d 1164, 1170 (11th Cir.1988); *Washington–Baltimore Newspaper Guild Local 35 v. Washington Star Co.*, 555 F.Supp. 257, 261 (D.D.C.1983), *aff'd*, 729 F.2d 863 (D.C.Cir.1984); *In re C.D. Moyer Co. Trust Fund*, 441 F.Supp. 1128, 1132 (E.D.Pa.1977), *aff'd*, 582 F.2d 1275 (3d Cir. 1978) (plan included language necessary to reserve the employer's right to the remaining trust assets).

Section 1344 ensures employers will "not be penalized for overfunding 'in an abundance of caution' or as a result of a miscalculation on the part of an actuary. Accordingly, employees will continue to be protected to the extent of their specific benefits but will not receive any windfalls due to the employer's mistake in predicting the

beneficiaries for benefits ... have been satisfied." 29 C.F.R. § 2618.2.

**14.** Section 1344(d) provides in relevant part:
> **(d) Distribution of residual assets; remaining assets**
> (1) Any residual assets of a single-employer plan may be distributed to the employer if—
> (A) all liabilities of the plan to participants and their beneficiaries have been satisfied,
> (B) the distribution does not contravene any provision of law, and
> (C) the plan provides for such a distribution in these circumstances.

29 U.S.C. § 1344(d) (1985).

**15.** Section 401 of Title 26 provides in relevant part:
> **(a) Requirements for qualification.**—A trust created or organized in the United States and forming part of a stock bonus, pension, or profit-sharing plan of an employer for the exclusive benefit of his employees or their beneficiaries shall constitute a qualified trust under this section—
> \* \* \* \* \* \*
> (2) if under the trust instrument it is impossible, at any time *prior to the satisfaction of all liabilities* with respect to employees and their beneficiaries under the trust, for any part of the corpus or income to be ... used for, or diverted to, purposes other than for the exclusive benefit of his employees or their beneficiaries....

26 U.S.C. § 401(a)(2) (1988) (emphasis added).

amount necessary to keep the Plan on a sound financial basis." *In re C.D. Moyer Co. Trust Fund*, 441 F.Supp. at 1132–33. *See also Chait v. Bernstein*, 835 F.2d 1017, 1027 (3rd Cir.1987); *Wright*, 641 F.Supp. at 1406–07.

Title II of ERISA allows reversion of surplus assets to the employer upon termination of a plan without loss to the plan of its tax exempt status. *See* 26 U.S.C. § 401(a)(2).[15] Treasury Regulation § 1.401–2(b)(1) defines "surplus" as "any balance remaining in the trust which is due to erroneous actuarial computations," *i.e.*, "arising because actual requirements differ from the expected requirements...." 26 C.F.R. § 1.401–2(b)(1).[16]

Title II of ERISA requires the vesting of all accrued benefits upon termination of a plan, not withstanding the vesting provisions contained by the plan, in order for the plan to retain tax-exempt status. 26 U.S.C. § 411(d)(3).[17] In addition, the Treasury,

**16.** Treasury Regulation § 1.401–2(b)(1) provides in relevant part:
> The intent and purpose in section 401(a)(2) of the phrase 'prior to the satisfaction of all liabilities with respect to employees ...' is to permit the employer to reserve the right to recover at the termination of the trust ... any balance remaining in the trust which is due to erroneous actuarial computations during the previous life of the trust. A balance due to an 'erroneous actuarial computation' is the surplus arising because actual requirements differ from the expected requirements.... For example, a trust has accumulated assets of $1,000,000 at the time of liquidation, determined by acceptable actuarial procedures ... as being necessary to provide the benefits in accordance with the provisions of the plan. Upon such liquidation it is found that $950,-000 will satisfy all of the liabilities *under the plan.* The surplus of $50,000 arises, therefore, because of the difference between the amounts actuarially determined and the amounts actually required to satisfy the liabilities. This $50,000, therefore, is the amount which may be returned to the employer as the result of an erroneous actuarial error.

26 C.F.R. § 1.401–2(b)(1).

**17.** Section 411(d)(3) of Title 26 provides in relevant part:
> [A] trust shall not constitute a qualified trust under section 401(a) unless the plan of which such trust is a part provides that—

the PBGC and the Department of Labor issued on 23 May 1984 joint administrative guidelines (the "Joint Guidelines"). The Joint Guidelines require employers to vest benefits of plan participants prior to terminating and spinning off a plan and prior to recapturing surplus assets. The Joint Guidelines require employers to cover accrued benefits prior to such spin-off and termination with annuity contracts. PBGC News Release 84-23 (23 May 1984), *reprinted at* 11 Pens.Rep. (BNA) 724 (28 May 1984). The Joint Guidelines provide:

> "[W]hen an employer terminates a defined benefit pension plan, it may not recover any surplus assets until it has fully vested all participants' benefits and has purchased and distributed annuity contracts to protect participants against the risk that their *accrued* benefits may be jeopardized by future market fluctuations or other factors."

*Id.* at ¶ 1.

ERISA, 29 U.S.C. § 1104(a)(1),[18] imposes on plan fiduciaries certain duties to participants. One court has described these duties as having three components: a "duty of loyalty" to plan participants, a duty of care to administer the plan "with the ... skill, prudence, and diligence ... [of] a prudent [person]" and a duty to act "for the exclusive purpose" of providing benefits to plan participants. *Berlin v. Michigan Bell Tel. Co.*, 858 F.2d 1154, 1162 (6th Cir.1988). In addition, section 1103(c)(1) contains ERISA's "exclusive ben-

efit rule" which provides that plan assets "shall never inure to the benefit of any employer and shall be held for the exclusive purposes of providing benefits to participants in the plan." 29 U.S.C. § 1103(c)(1).[19]

The ERISA exclusive benefit rule, 29 U.S.C. § 1103(c)(1), specifically makes an exception for the recapture of surplus assets by employers pursuant to section 1344(d)(1) following termination of a plan. Courts therefore generally hold the exclusive benefit rule does not prohibit employers from recouping assets in excess of those required to meet plan liabilities prior to termination. *See, e.g., Audio Fidelity Corp. v. Pension Ben. Guaranty Corp.*, 624 F.2d 513 (4th Cir.1980); *Walsh v. Great Atlantic & Pacific Tea Co.*, 96 F.R.D. 632 (D.N.J.1983), *aff'd*, 726 F.2d 956 (3d Cir.1983); *In re C.D. Moyer Co. Trust Fund*, 441 F.Supp. at 1128.

A plan which contains language parroting the language of the ERISA exclusive benefit rule will not be found to prohibit reversion of surplus assets to an employer. *Fechter v. HMW Industries, Inc.*, 879 F.2d 1111, 1117 (3d Cir.1989); *Chait*, 835 F.2d at 1026 ("A rule that read ERISA 'exclusive benefit' language to prohibit reversion to the employer might tempt employers to be overly cautious in funding their plans[,] ... a result that would benefit no one."); *Wright*, 641 F.Supp. at 1406–

---

(A) upon its termination or partial termination ...

\*　　\*　　\*　　\*　　\*　　\*

the rights of all affected employees to benefits accrued to the date of such termination, partial termination, or discontinuance, to the extent funded as of such date, or the amounts credited to the employees' accounts, are nonforfeitable....

26 U.S.C. § 411(d)(3).

**18.** Section 1104 provides in relevant part:

**(a) Prudent man standard of care**

(1) *Subject to sections 1103(c) and (d), 1342 and 1344 of this title*, a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and—

(A) for the exclusive purpose of:

(i) providing benefits to participants and their beneficiaries; and

(ii) defraying reasonable expenses of administering the plan;

(B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims....

29 U.S.C. § 1104(a) (1985) (emphasis added).

**19.** Section 1103(c)(1) provides in relevant part:

*Except as provided ... under sections 1342 and 1344 of this title* (relating to termination of insured plans), the assets of a plan shall never inure to the benefit of any employer and shall be held for the exclusive purposes of providing benefits to participants in the plan and their beneficiaries and defraying reasonable expenses of administering the plan.

29 U.S.C. § 1103(c)(1) (1985).

07 ("Common sense dictates that employers which fund plans under ERISA guidelines should not be penalized for overfunding in an abundance of caution or as a result of miscalculation by the actuary.").

■ Only where the language of a plan clearly prohibits all reversions to an employer or prohibits any amendment to the plan which permits such reversions will a plan be held to prohibit the recapture of surplus assets despite the allowance of section 1344(d)(1). *See, e.g., Bryant v. International Fruit Products Co.,* 793 F.2d 118, 122–23 (6th Cir.), *cert. denied,* 479 U.S. 986, 107 S.Ct. 576, 93 L.Ed.2d 579 (1986); *Delgrosso v. Spang and Co.,* 769 F.2d 928, 935 (3d Cir.1985), *cert. denied,* 476 U.S. 1140, 106 S.Ct. 2246, 90 L.Ed.2d 692 (1986); *Rosenbaum v. Davis Iron Works, Inc.,* 669 F.Supp. 813, 818–20 (E.D. Mich.1987), *aff'd in part and rev'd in part,* 871 F.2d 1088 (6th Cir.), *cert. denied,* — U.S. ——, 110 S.Ct. 235, 107 L.Ed.2d 186 (1989).

Section 1104(a)(1) governing fiduciary duties under ERISA also makes specific exception for the recapture of surplus assets by employers pursuant to section 1344(d)(1) following termination of a plan. The recapture of excess assets following the termination of a plan, therefore, has been held to not constitute a breach of fiduciary duties. *See, e.g., Amalgamated Clothing & Textile Workers Union v. Murdock,* 861 F.2d 1406 (9th Cir.1988); *International Union, United Automobile, Aerospace and Agricultural Implement Workers v. Dyneer Corp.,* 747 F.2d 335 (6th Cir.1984); *Washington–Baltimore Newspaper Guild,* 555 F.Supp. at 257; *Pollock v. Castrovinci,* 476 F.Supp. 606 (S.D. N.Y.1979), *aff'd,* 622 F.2d 575 (2d Cir.1980).

c. *Transfers of Plan Assets Under ERISA and ERISA's Exclusive Benefit Rule and Fiduciary Duty Provisions*

■ In addition to permitting the termination of a plan and the recapture of excess assets, ERISA also permits the transfer of assets from one plan to another.[20] 29 U.S.C. § 1058.[21] Transfer of assets may only be accomplished, however, where sufficient assets are transferred to cover the extent of the liabilities which would exist had the plan been terminated. *Id.; United Steelworkers of America, Local 2116 v. Cyclops Corp.,* 860 F.2d 189, 199 (6th Cir. 1988). Where a transfer is effected by moving assets of a defined benefit plan into a spun-off plan,[22] the spun-off plan is only required to cover benefits calculated "on a termination basis," or benefits accrued through the date of the spin-off. 26 C.F.R. § 1.414(1)–1(n);[23] *Cyclops Corp.,* 860 F.2d at 199.

The Joint Guidelines set forth what conditions must be met by an employer in a spin-off and termination of a plan in order for the employer to recoup excess assets

---

**20.** Under Treasury Regulation 26 C.F.R. § 1.414(1)–1(b)(3), a transfer has taken place "when there is a diminution of assets or liabilities with respect to one plan and the acquisition of these assets or the assumption of these liabilities by another plan." 26 C.F.R. § 1.414(1)–1(b)(3).

**21.** Section 1058 provides in relevant part:

A pension plan may not merge or consolidate with, or transfer its assets or liabilities to, any other plan ... unless each participant in the plan would (if the plan then terminated) receive a benefit immediately after the merger, consolidation, or transfer which is equal to or greater than the benefit he would have been *entitled* to receive immediately before the merger, consolidation, or transfer (if the plan had then terminated).

29 U.S.C. § 1058 (emphasis added).

**22.** A spinoff is defined by Treasury Regulation § 1.414(1)–1(b)(4) as "the splitting of a single plan into two or more plans." 26 C.F.R. § 1.414(1)–1(b)(4).

**23.** Treasury Regulation § 1.414(1)–1(n) provides in relevant part:

*Spin-off of a defined benefit plan ...* In the case of a spinoff of a defined benefit plan, the requirements of section 414(1) will be satisfied if—
 (i) All of the accrued benefits of each participant are allocated to only one of the spun off plans, and
 (ii) The value of the assets allocated to each of the spun off plans is not less than the sum of the present value of the *benefits on a termination basis* in the plan before the spin off for all participants in that spun off plan.

26 C.F.R. § 1.414(1)–1(n) (emphasis added).

without violating the Exclusive Benefit Rule. In addition to fully vesting benefits and covering all benefits accrued as of the date of termination by the purchase of annuity contracts, an employer must provide participants with "advance notice of the transaction in similar time and manner as if the entire similar plan were being terminated." Joint Guidelines, 11 Pens. Rep. (BNA) at 724.

■ A transfer of assets pursuant to section 1058 and recoupment of surplus assets by the employer does not violate the ERISA exclusive benefit rule. In *Holliday v. Xerox Corp.*, 732 F.2d 548 (6th Cir.), *cert. denied*, 469 U.S. 917, 105 S.Ct. 294, 83 L.Ed.2d 229 (1984), employees formerly employed by companies acquired by the employer ("Xerox") deposited pension accounts acquired in the course of their previous employment into the "optional" pension fund of Xerox. Xerox transferred these accounts into its Retirement Income Guarantee Plan ("RGIP") to offset contributions to the RGIP. The employees whose accounts were so transferred claimed the transfer was done in order to reduce contributions to the RGIP by Xerox in violation of the exclusive benefit rule. The court determined Xerox did not violate the exclusive benefit rule, holding:

> The language of ERISA stating that "the assets of a plan shall never inure to the benefit of any employer" cannot be read as a prohibition against any decisions of an employer with respect to a pension plan which have the obvious primary purpose and effect of benefitting the employees, and in addition the incidental side effect of being prudent from the employer's economic perspective. As the legislative history makes clear, ERISA recognizes the inherent tension between the desire that employees retire with adequate retirement income and the practical internal pressures exerted on the trustees charged with preserving the assets of the pension fund.... Congress did not intend the Act to penalize employers for exercising their discretion to make rational economic decisions which are both in the best interests of

the preservation of the fund and which are also not adverse to the employer's interests.

*Id.* at 552.

■ The transfer of assets by employers pursuant to section 1058 and recoupment of surplus assets following transfer do not constitute a breach of fiduciary duties where plan liabilities have been satisfied. In *Bigger v. American Commercial Lines, Inc.*, 862 F.2d 1341, 1343–44 (8th Cir.1988), the participants of a spun-off plan claimed the employer breached its fiduciary duty under section 1104(a) to act for the exclusive purpose of providing benefits to participants when it recouped assets above the amount needed to satisfy plan liabilities rather than allocate them to the spun-off plan. *Bigger*, 862 F.2d at 1343–44. The court phrased the issue as whether a general provision of ERISA such as section 1104(a) supersedes a specific provision such as section 1058 containing the standard to apply in the transfer context. The court found:

> A well-established principle of statutory construction ... is that a specific statutory provision prevails over a more general provision. *See Clifford F. MacEvoy Co. v. United States*, 322 U.S. 102, 64 S.Ct. 890, 88 L.Ed. 1163 (1944) (quoting *Ginsberg & Sons v. Popkin*, 285 U.S. 204, 52 S.Ct. 322, 76 L.Ed. 704 (1932)). This rule applies with special force with regard to a reticulated statute such as ERISA. Given this complicated statutory scheme, it seems reasonable to conclude that Congress, whenever possible, attempted to clarify what conduct satisfies the fiduciary standards. Section 1058 provides such guidance in the context of transferring plan assets.

*Id.* at 1344 (parallel citations omitted).

The *Bigger* court therefore held the transfer and recoupment of excess assets following the transfer did not violate the employer's fiduciary duties. It added: "It would seem anomalous for Congress to permit total recoupment of excess assets upon termination but to prohibit recoupment during a spinoff." *Id.* at 1345. *See also Cyclops Corp.*, 860 F.2d at 201 (failure

to fund transferee plan with more assets than required to cover benefits calculated on a termination basis was not a violation of section 1103 or section 1104); *Bass v. Retirement Plan of Conoco, Inc.,* 676 F.Supp. 735, 745 (W.D.La.1988) ("It is no violation of a trustee's fiduciary duties to take a course of action which reasonably promotes the interest of plan participants simply because it incidentally also benefits the corporation") (quoting *Morse v. Stanley,* 732 F.2d 1139, 1146 (2d Cir.1984)).

■ In the instant case, Lynch concedes Stevens satisfied its obligations with respect to the accrued benefits of Salaried Plan participants as of 30 June 1984, the effective date of the restructuring, by its purchase of the MONY annuity contracts. *See* Nadler Cert. at 17 ("[T]he MONY annuity contracts ... covered the accrued benefits up to June 30, 1984."); Nadler Cert. at 7 ("Stevens provided only for the accrued benefits of the plan participants through June 30, 1984...."); Opposition at 53 ("[T]he pension asset reversion [left] Lynch's pension benefits unprotected *after* July 1, 1984....") (emphasis added). Lynch also concedes the recaptured assets were surplus assets which were not needed to recover these Salaried Plan liabilities. Complaint at 11 ("[Stevens] improperly recovered $112 million of *excess* assets from the salaried plan.") (emphasis added). The claim of Lynch is that Stevens violated ERISA's exclusive benefit rule and fiduciary duty provisions because the reversion constituted use of Salaried Plan assets for company purposes. *See supra* at 992 n. 10.

As described previously, effective 1 July 1984, after it received all necessary agency approvals including a Notice of Sufficiency from the PBGC, Stevens transferred sufficient funds to cover benefits for active employees accrued as of 30 June 1984 from the Salaried Plan into the On–Going Plan and covered such liability with a MONY annuity contract. It then transferred remaining funds in the Salaried Plan into the Retiree Plan, covered the benefits for retired employees accrued as of 30 June 1984 with a MONY annuity contract and recap-

tured the $112 million remaining above the sum needed for the purchase of the annuity contracts. It then technically terminated the Retiree Plan, whereby Retiree Plan participants accrued no additional benefits (to which, under a benefits formula which provided benefits based on service, these retired employees were not entitled) and whereby no additional members were added. These facts are undisputed.

As discussed previously, it is only accrued benefits of employees which are protected by ERISA. Lynch concedes accrued liabilities as of 30 June 1984 were met by the annuity contracts. Section 1344 permitted termination of the Retiree Plan and recapture of assets above those needed to satisfy accrued liabilities if the Retiree Plan so permitted and if such conduct did not violate any provision of law. *See* 29 U.S.C. § 1344.

As mentioned, Lynch concedes accrued liabilities of the Retiree Plan were met, and he does not suggest any violation of the law by the Defendants other than a violation of ERISA's exclusive benefit rule and fiduciary duty provisions. It is undisputed that the terms of the Retiree Plan permitted its termination and the recovery by Stevens of surplus assets. *See* Retiree Plan at 44. Such terminations do not violate ERISA's exclusive benefit rule or fiduciary duty provisions.

In addition, section 1058 permitted the transfer of assets from the Salaried Plan to the On–Going Plan if sufficient assets were transferred to satisfy accrued liabilities of On–Going Plan members as of the effective date of transfer. Lynch concedes such liabilities were annuitized and the Salaried Plan permitted transfer of assets. *See* 1983 Plan at 42–43. Such transfers do not violate ERISA's exclusive benefit rule or fiduciary duty provisions. Moreover, the Joint Guidelines provide the reversion of surplus assets following a spin-off and termination does not constitute a violation of the exclusive benefit rule if accrued liabilities as of the effective date are satisfied by the purchase of annuity contracts and if such benefits are vested. *See* Joint Guide-

lines, 11 Pens.Rep. (BNA) at 724.[24] The consistent and uniform interpretations by agencies responsible for enforcing and interpreting ERISA are entitled to great deference. *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 843 n. 11, 104 S.Ct. 2778, 2782 n. 11, 81 L.Ed.2d 694 (1984), *reh'g denied,* 468 U.S. 1227, 105 S.Ct. 28, 82 L.Ed.2d 921 (1984). *Blessitt,* 848 F.2d at 1167–68.

■ To the extent Lynch claims the restructuring and reversion were illegal because of a *per se* breach of the fiduciary duties of the Pension Committee and Durst caused by their dual roles as members of the Board of Directors and fiduciaries for the Salaried Plan, *see* Complaint at 8, such claims are rejected. A fiduciary of a plan does not *per se* breach fiduciary duties to plan participants simply by virtue of a dual role. "Officers of a corporation often are trustees of its benefit plan. It is no violation of a trustee's fiduciary duties to take a course of action which reasonably best promotes the interest of plan participants simply because it incidentally also benefits the corporation." *Morse,* 732 F.2d at 1139.

Lynch has not, as a matter of law, described conduct by the Defendants related to the reversion and the restructuring which violated ERISA's exclusive benefit rule and fiduciary duty provisions.

### 3. *Funding of Accrued Benefits for Salaried Plan Participants and the Implementation of the Restructuring and Reversion*

Lynch asserts at Point II of his Opposition the "reversion is illegal since Stevens did not satisfy all liabilities of the plan at the time of the spin off termination." Op-

position at 55. The claim by Lynch that the reversion was illegal because Salaried Plan obligations had not been satisfied prior to the reversion is discussed below.

#### a. *Funding for Benefits for Future Service*

■ At Point II of his Opposition, Lynch asserts Stevens did not meet all Salaried Plan liabilities prior to the restructuring and reversion because it did not fund benefits for future service by employees:

> Prior to the Stevens reversion action, Chad Ross, actuary, explained to Stevens that a spin off termination included provision for the future pay liability of the active plan paticipants [sic] including Lynch. Yet Stevens [sic] brief denies that a future pay liability is required to be satisfied in the pension plan reversion. The actuary determines, however, what are liabilities of the plan to its participants.... Stevens also acknowledges that ... future pay liability was an actuarial liability of the plan prior to the reversion. The difficulty with Stevens [sic] position is that Stevens maintains legally that the original salaried plan has not been terminated.... Nevertheless, Stevens has terminated the original Salaried employees plan without notice to Lynch and other participants.

Opposition at 56–57.[25]

In addition to the assertions by Lynch, Herbert Nadler ("Nadler"), a consulting actuary and expert witness for Lynch, stated in his certification the future pay liability of the Salaried Plan may not have been met by Stevens prior to the reversion.[26]

---

**24.** For an explanation of why Stevens as a matter of law satisfied the notice requirement of the Joint Guidelines, see *infra* at 1014–1016.

**25.** It is not clear from the Opposition whether or how the claim of inadequate notice to participants is relevant to the claim of underfunding.

In addition, this claim is based upon the unsworn allegation of counsel for Lynch and thus is inadequate to create an issue of material fact so as to defeat summary judgment. *Schoch v. First Fidelity Bancorporation,* 912 F.2d 654, 657 (3d Cir.1990). For other instances in which

Lynch relies on unsworn allegations of counsel, see *infra* at 1007, 1008, 1009, 1010, 1011, 1014, 1016, 1017, 1020.

**26.** Nadler certified:

I have reviewed certain documents which indicates [sic] that the Stevens Pension and Benefits Committee changed the investment rate of return from 6% to 7% in 1982, 7% to 8% in September 1983 and 8% to 9% in March 1984.... It is actuarial practice to increase the future salary pay increase assumptions at the same time that the investment rate of return is increased since those two future

■ The claim that the restructuring and reversion were illegal because future pay liability was not funded prior to effecting them is not within the parameters of the Complaint and is therefore not before this court for decision. However, even if Lynch had presented this claim in the Complaint, such claim would fail as a matter of law.[27]

Claims by plan beneficiaries for benefits based on future service have been denied because such benefits are unearned and unaccrued and therefore not protected by ERISA. *May v. Houston Post Pension Plan*, 898 F.2d 1068, 1070 (5th Cir.1990) (terminated employee was not entitled to benefits to which he would have been entitled had he worked until his normal retirement date because such claim was not for accrued and earned benefits); *Blessitt*, 848 F.2d at 1172 (plan participants were not entitled to benefits for anticipated future service because "an employer must satisfy only the employees' *accrued* benefits under the plan—not benefits that would accrue in the future if the employees continued to work for the employer after the plan terminates—before a reversion of the residual assets is permitted.") (emphasis in original).

In *Blessitt*, an employer terminated its pension plan after it sold substantially all of its assets. *Blessitt*, 848 F.2d at 1165. It distributed benefits to participants which it calculated in accordance with the terms of the plan and recaptured the surplus. *Id.* Participants of the plan sued the employer, alleging the reversion was excessive because the employer failed to calculate as plan obligations benefits for the years remaining to the age of retirement the plaintiffs would have worked had the employer not sold its assets and terminated the plan. *Id.* at 1165–67.

The *Blessitt* court found the claim by the plaintiffs for benefits for anticipated future service to be "untenable." *Id.* at 1167. It observed the plan provided two formulas for the calculation of retirement benefits, one based on retirement at normal retirement age and the other on early retirement. Neither formula granted benefits for anticipated future service, *i.e.*, for unaccrued benefit expectancies. *Id.* at 1169. The court denied the claim of the plaintiffs because the claim was for unearned benefits unprotected by ERISA and because the claim was inconsistent with the purposes of ERISA:

> Rather than enabling employees to get "something for nothing"—i.e. to receive present benefits for anticipated future years of employment which have not actually been and may never be worked— which is the inescapable result of Blessitt's approach, the essential purpose of ERISA is to prevent employees from getting "nothing for something"—to prevent them from receiving fewer benefits

---

events act in parallel. Such actuarial assumptions as to investment rate of return and future pay increase are effective for the entire year of 1984 and not just applicable to a projected June 30, 1984 spin-off termination date for the spun off "retired" pension plan and Stevens took a reduction of its 1984 pension expense in its financial statements by virtue of the increase in investment rate of return. Since Stevens took a tax deduction for the pension expansion for the entire 1984 year, the future pay liability was a liability of the plan which required funding by Stevens. No funding for future pay liability was provided by Stevens in the reversion.

Nadler Cert. at 3–5. He later states:

> All of Stevens plan participants were notified that a spin-off termination would be accomplished, therefore, that the active on-going plan would continue and that there was sufficient monies to meet "all promised benefits".

All promised benefits include not only the past service but future service of the plan participants including the future pay liability which had been adequately funded in June 1984 by having sufficient assets to meet the pension plan liabilities. The pension plan document requires funding for past and future service, and future service was a plan liability prior to the reversion and continued to be after the reversion.

Nadler Cert. at 6. In addition, Nadler later states:

> Stevens attempted to set up, with the actuary's help, a complete termination of the on-going pension plan as of January 1, 1985 with an unfunded accrued liability for future pay of $29,161,462.00.

Nadler Cert. at 14.

27. For a list of instances in which the submissions of Lynch contain claims not contained in the Complaint, *see supra* at 991 n. 8.

than those they accrue through years of service.

*Id.* at 1176.

Lynch asserts the Defendants were obligated to cover benefits for future service by the annuity contracts because the method of funding used by Stevens to fund the Salaried Plan took into consideration future service benefits liability. However, regardless of the funding method used, the benefits formula of the Salaried Plan called for benefits based on years of service and level of compensation. *See* 1983 Plan at 10. Thus, benefits for future service did not accrue under the Salaried Plan and, as unaccrued benefits, are not protected by ERISA. Stevens was therefore not required to have the annuity contracts cover them.

Lynch has not, as a matter of law, stated a claim that the restructuring and reversion were illegal because Stevens did not fund or provide by the purchase of annuity contracts for benefits based on future service.

### b. *Funding for Benefits Accrued through 26 June 1985*

▉ While not addressed in the Opposition or Complaint of Lynch, Nadler and Paul Munter ("Munter"), a certified public accountant and expert witness for Lynch, appear to suggest the annuity contracts should have covered benefits accrued through 26 June 1985, the date of the implementation of the spin-off and termination, because 26 June 1985 was in fact the effective date.[28]

As stated, this claim is not within the parameters of the Complaint, and is therefore not before this court for decision. However, even if Lynch had presented this claim in the Complaint this claim would fail as a matter of law.[29]

Section 1341 of ERISA allows a plan administrator to propose an effective date for the voluntary termination of a single-employer pension plan and anticipates that the effective date may be earlier than the date of actual implementation. *See* 29 U.S.C. § 1341.[30] Section 1348 deems as the effective date for a section 1341 plan termination the date proposed by the plan admin-

---

**28.** Munter states he reviewed the 23 October 1986 Stone Letter to IRS, Munter Cert. at 1, in which Stone represented: "In the spinoff that occurred in the instant case, the transferred benefits were calculated as of June 26, 1985, not June 30, 1984, and the assets transferred to each of the two plans after the split was sufficient for the benefits valued as of June 26, 1985, not benefits valued as of June 30, 1984." *See* 23 October 1986 Stone Letter to IRS. Munter concludes: "Mr. Stone's letter makes it quite clear that funding for the On–Going Pension Plan is required until June 27, 1985. Applicable company records indicate that the active On-going Pension Plan had a 'zero' balance on June 27, 1985." Munter Cert. at 18. However, Lynch acknowledges in his Opposition that the 23 October 1986 Stone Letter to IRS does not definitely set forth the effective date of the spin-off and termination:

The IRS disagreed with Stevens legal position to terminate the existing Plan effective December 31, 1984 for funding the new active plan. Buck Consultants wrote to Dan Stone, Esq., on December 8, 1986 (Munter Exhibit CCC) stating that the termination of the existing Salaried Employee Pension Plan is effective July 1, 1984 according to the IRS.

Opposition at 25. Exhibit CCC of the Munter Cert. is the 8 December 1986 Buck Letter to Stone, in which Stone is advised: "The IRS position is that the reversion is retroactive in effect to July 1, 1984 without opportunity to elect to treat it as effective January 1, 1985 for minimum funding purposes. Under this approach the basic plan is fully funded through July 1, 1984 and then terminated. The spin-off plan goes into effect on July 1, 1984...." 8 December 1986 Buck Letter to Stone.

**29.** For a list of instances in which the submissions of Lynch contain claims not contained in the Complaint, *see supra* at 991 n. 8.

**30.** Section 1341 provides in relevant part:

(a) **Filing of notice that plan is to be terminated**
Before the effective date of the termination of a single-employer plan, the plan administrator shall file a notice with the [PBGC] that the plan is to be terminated on a proposed date (which may not be earlier than 10 days after the filing of the notice), and for a period of 90 days after the proposed termination date the plan administrator shall pay no amount pursuant to the termination procedure of the plan unless, before the expiration of such period, he receives a notice of sufficiency under subsection (b) of this section. Upon receiving such a notice, the plan administrator may proceed with the termination of the plan in a manner consistent with this subtitle.
29 U.S.C. § 1341(a) (1985).

istrator and approved by the PBGC. *See* 29 U.S.C. § 1348.[31]

By granting the plan administrator the authority to determine, with the approval of the PBGC, the effective date of a voluntary plan termination, the plan administrator "is granted the opportunity to determine when the employer's obligation to fund the plan ceases, when employees can no longer accrue benefits, and when [the] PBGC may be required to make good on its guarantee." *In re Syntex Fabrics, Inc. Pension Plan*, 698 F.2d 199, 203 (3d Cir. 1983) (citing H.R.Rep. No. 869, 96th Cong., 2d Sess. 101, *reprinted in* 1980 U.S.Code Cong. & Admin.News 2918, 2969). Once the proposed effective date of termination is approved by the PBGC, the proposed date becomes the final termination date and the plan administrator is without discretion to assign a new termination date. *Id.* at 204.

In the context of transfers of plan assets, plan administrators may calculate the amount of assets which must be transferred to cover plan liabilities by calculating accrued benefits as of the effective date of the transfer. Treasury Regulation § 1.414(1)–(b)(11) sets forth criteria to determine the date on which a transfer or spin-off will be deemed to have occurred. 26 C.F.R. § 1.414(1)–(b)(11).[32] The regulation "clearly acknowledges that as an accounting matter [a] 'spin-off' can precede the 'actual transfer' of funds." *Bass*, 676 F.Supp. at 748. As a matter of law, the date of a transfer of assets is the date as of which transferee plan liabilities and the amount which must be transferred to the transferee plan to cover these liabilities

were calculated, not the date of actual transfer. *Id.* A plan will not be required to transfer assets on the date deemed as the effective date because, as explained in *Bigger:*

> [T]ransferring plan assets on the effective date would be difficult if not impossible. The present value of the assets must be calculated as of a certain date. Transferring the assets on that same date is logistically impossible because time is necessary to obtain agency approval for the new plan before money is actually transferred into it. Further maximizing the value of the assets requires an orderly liquidation of assets to transfer funds from the old plan into the new plan.

*Bigger*, 862 F.2d at 1348.

In the instant case, Lynch argues plan liabilities of the On–Going Plan should have been calculated through 26 June 1985. Lynch makes this argument based on his interpretation of the 23 October 1986 Stone Letter to IRS, which he states notified the IRS the effective date of the restructuring for purposes of calculating accrued benefits was the date of actual transfer. Munter Cert. at 1. However, Lynch at the same time asserts the IRS rejected the implementation date as the date as of which benefits were to be calculated and insisted on the effective date for this purpose, 30 June 1984. Opposition at 25.

To the extent Lynch claims that accrued benefits should have been calculated to 26 June 1986 and covered by the annuity contracts because 26 June 1986 was in fact the

---

**31.** Section 1348 provides in relevant part:

 **(a)** For purposes of this subchapter the date of termination of a single-employer plan is—

 **(1)** in the case of a plan terminated in accordance with the provisions of section 1341 of this title, the date established by the plan administrator and agreed to by the [PBGC]. . . .

29 U.S.C. § 1348(a)(1) (1985).

**32.** Treasury Regulation § 1.414(1)–(b)(11) provides in relevant part:

 *Date of Merger of Spin–Off.* The actual date of a merger or spinoff shall be determined on the basis of the facts and circumstances of the

particular situation. For purposes of this determination, the following factors, none of which is necessarily controlling, are relevant:

 (i) The date on which the affected employees stop accruing benefits under one plan and begin coverage and benefit accruals on another plan.

 (ii) The date as of which the amount of assets to be eventually transferred is calculated.

 (iii) If the merger of spinoff agreement provides that interest is to accrue *from a certain date to the date of actual transfer,* the date from which such interest will accrue.

26 C.F.R. § 1.414(1)–1(b)(11) (emphasis added).

effective date, the claim of Lynch is inadequate; he concedes this date was not accepted by the relevant regulatory authorities.

To the extent Lynch claims that accrued benefits should have been calculated to 26 June 1986 and covered by the annuity contracts as of that date because benefits must be calculated from the date of actual implementation of the restructuring, not from the effective date, such claim is also inadequate. As discussed previously, the relevant case law and applicable statutes and regulations provide the date of termination is the date proposed by the plan administrator and approved by the PBGC and permit calculation of assets needed to cover liabilities, in both the termination and transfer contexts, as of an effective date.

As also discussed previously, Stevens notified the PBGC the effective date for the restructuring and reversion was 1 July 1984. The PBGC issued to Stevens a Notice of Sufficiency which designated 1 July 1984 as the date of termination. Thus, Stevens was obligated to calculate accrued liabilities for the Retiree Plan, which was terminated, as of 30 June 1984, the date approved by the PBGC, and was permitted to calculate accrued liabilities for the On-Going Plan, into which Salaried Plan assets were transferred, as of the same date.

Lynch cannot claim the restructuring and reversion were illegal because liability for

benefits calculated through 26 June 1985 was not covered by the annuity contracts.[33]

#### c. Funding for the Window

■■■ While not addressed by Lynch in the argument portion of his Opposition,[34] Lynch appears to allege in his Complaint that the restructuring and reversion were illegal because liability for the "Window" was not covered by the annuity contracts.[35]

The restructuring and reversion were effective 1 July 1984. As discussed previously, the Window was authorized by the Board of Directors on 15 May 1986 and ratified, as an amendment to the On-Going Plan, on 21 January 1987, with an effective date of 19 May 1986. See 21 January 1987 Board Resolution.

The Window was not an accrued benefit on the effective date of the restructuring and reversion. Lynch cannot claim the restructuring and reversion were illegal because liability for the Window was not covered by the annuity contracts.

#### d. Funding for the Increase in Salaried Plan Benefits

■■■ While not addressed in the Opposition or Complaint, Nadler and Munter appear to suggest the annuity contracts should have covered the increase in pension benefits approved at the 17 April 1984 meeting of the Board of Directors.[36]

---

**33.** To the extent Lynch claims liability for benefits accrued through 26 June 1985 were not funded by Stevens, such claim is not the subject of the present Motion by the Defendants. By mutual agreement of the Parties, the sufficiency of the funding of the On-Going Plan following the restructuring and reversion is to be decided at a future time. See supra at 981–82 n. 3.

**34.** In the facts portion of his Opposition, Lynch states: "On June 27, 1985, Stevens completely recovered the assets of the Salaried Employee Pension Plan. No funding was left for the impending Early Retirement Window Plan." Opposition at 31.

**35.** This characterization of Lynch's claim is based on his assertion: "No actuarial calculation was made by the pension committee for the funding of this amendment to the retirement

pension plan prior to the establishment of the amendment." Complaint at 11–12.

**36.** Nadler asserts:

Stevens did not satisfy its liability promise to the retirees of a 2% monthly pension increase for the period 1980 to April 1984 if the reversion were approved. This was a liability that should have been paid from the reversion funds and should not be considered a liability of the on-going active plan since it covers plan participants of the spun-off "retired" plan.

Nadler Cert. at 10–11. Munter states:

The original Salaried Employees Pension Plan was terminated effective July 1, 1984 with a new plan for active employees and a spun off retired plan which is said to be terminated on the same date. The retired plan participants were promised a 2% pension increase retroactive to 1980. Munter Supp. Cert. at 8.

As stated, this claim is not within the parameters of the Complaint, and is therefore not before this court for decision. However, even if Lynch had included it in his Complaint, this claim fails as a matter of law.[37]

The benefits increase was conditionally adopted in the 17 April 1984 Board Resolution which also provided for the restructuring and reversion. The 17 April 1984 Board Resolution expressly conditioned the benefits increase and the restructuring and reversion on the successful implementation of all prerequisite steps. *See* 17 April 1984 Board Minutes. It was not until 25 June 1985 that Stevens received all necessary agency approvals for the restructuring and reversion. The restructuring and reversion were implemented on 27 June 1985. Also on 27 June 1985, Stevens notified Salaried Plan participants the payment of increased benefits would commence in August 1985. These facts are undisputed.

Because the 17 April 1984 Board Resolution was not effective until 25 June 1985, when the last agency approval for the restructuring and reversion was received, the benefits increase was not an accrued benefit on 1 July 1984, the effective date of the restructuring and reversion. Lynch cannot as a matter of law claim the restructuring and reversion were illegal because liability for the benefits increase was not covered by the annuity contracts.

e. *Funding for Early Retirement Subsidies*

 While not addressed in the Opposition or Complaint of Lynch, Nadler and Munter appear to suggest the annuity contracts should have covered early retirement benefits.[38] Early retirement benefits are benefits commencing before normal retirement age, which is age sixty-five, or earlier if so provided in a plan. 29 U.S.C. § 1002(24) (defining normal retirement age); *Hlinka v. Bethlehem Steel Corp.,*

---

**37.** For a list of instances in which the submissions of Lynch contain claims not contained in the Complaint, *see supra* at 991 n. 8.

**38.** Nadler contends:

By removing all of the salaried employee pension assets from the master trust, Stevens provided only for the accrued benefits of the plan participants through June 30, 1984. However, such MONY guarantee did not include certain early retirement subsidies which were evidently overlooked by the Buck actuary and required an adjustment between MONY's assets and the Northern Trust funding for the on-going plan. I have reviewed the Certification of Thomas Hardy, MONY Vice President, which states that Joseph P. Lynch has his early retirement subsidy covered up to June 30, 1984 by MONY and any early retirement subsidy after July 1, 1984 would be covered by the on-going plan. At the time of the reversion, however, such early retirement subsidies for Lynch and others were not covered and an adjustment or increase to the MONY contract of what appears to be $11 million was made in October or November 1987.

Nadler Cert. at 7. Nadler does not cite to any documents as support for his contention that early retirement benefits were not covered by the annuities. Nadler states further in his certification:

No actuarial computation was evidently made for unreduced early retirement subsidies which Stevens had for its employees that met certain eligibility criteria. Stevens' severance

policy provided for unreduced early retirement benefits when a laid off employee had a combination of 80 years of age plus company service. Such severance pay would be added as additional compensation and would be computed as part of the employee's pension formula. Such present values of accrued benefits are guaranteed up to June 30, 1984 under the MONY guarantee but, provision had to be made as well for the early retirement subsidies, an impending early retirement "window", the normal cost for the period subsequent to June 30, 1984 as well as the future pay liability of the active employees in accordance with the plan document formula.... These plan liabilities were not satisfied for the period up to June 30, 1984 since Stevens did not leave any pension assets in the on-going active salaried employees pension account.

Nadler Cert. at 9–10. In addition, Munter states:

I have read correspondence that confirms that both the actuary and Stevens did not consider the early retirement subsidy as part of MONY's annuity obligation. I must therefore conclude that at the time of reversion in June 1985, Mr. Lynch's early retirement subsidy liability was not covered and therefore MONY did not cover all of the accrued pension liabilities of the plan at plan termination.

Munter Supp.Cert. at 9. Munter does not cite to the documents upon which his conclusion is based and the identity of the documents is not by any means clear from the submissions of the Parties.

863 F.2d 279, 281 (3d Cir.1988).[39]

As stated, this claim is not within the parameters of the Complaint, and is therefore not before this court for decision. However, even if Lynch had included it in his Complaint, the claim must fail as a matter of law.[40]

In *Hlinka*, the Third Circuit rejected the position that early retirement subsidies constitute accrued benefits protected by ERISA. 863 F.2d at 284. In *Hlinka*, the fifty-six year old plaintiff applied for a "70/80 retirement pension." The 70/80 retirement pension was an early retirement subsidy which qualified an employee for a pension if the employee's age and years of continuous service equaled seventy or eighty years and if the employee met one of three conditions, including the condition that the employee's early retirement is in the company's interest. *Id.* at 280 n. 2, 281. The plaintiff applied for but was denied the 70/80 retirement pension because while he met the age and service prerequisite, his early retirement was not in the company's interest and he failed to satisfy either of the other two conditions. *Id.* at 281. The plaintiff sued the company, arguing that the 70/80 retirement pension did not use the word "early" and so could not be described as an early retirement benefit. *Id.*

The *Hlinka* court found the 70/80 retirement pension was an early retirement benefit because it provided for benefits prior to normal retirement age. *Id.* The court reviewed the following text from the legislative history of ERISA:

> The term "accrued benefit" refers to pension or retirement benefits and is not intended to apply to certain ancillary benefits.... To require the vesting of these ancillary benefits would seriously complicate the administration and increase the cost of plans whose primary function is to provide retirement income.... Also, the accrued benefit to which the vesting rules apply is not to include such items as the value of the right to receive benefits commencing at an age before normal retirement age....
>
> Generally, an individual's "accrued benefit" under a defined benefit plan is to be expressed in the form of an annual benefit commencing at normal retirement age.

*Id.* at 284 n. 9 (quoting H.R.Rep. No. 807, 93d Cong., 2d Sess. 57, *reprinted in* 1974 U.S.Code & Admin.News 4639, 4670, 4726). Based on this legislative history, the court found ERISA offered no protection for early retirement benefits:

> ERISA does not obligate a plan to pay employee benefits before normal retirement age. ERISA specifically refers to normal, rather than early retirement in the context of accrued benefits.... [T]he district court properly determined that early retirement benefits are not accrued benefits under ERISA."

*Id.* at 284.[41] *See also Ashenbaugh*, 854 F.2d at 1526; *Bencivenga v. Western*

---

**39.** Under the terms of the Salaried Plan, normal retirement age is defined as age sixty-five. 1983 Plan at 3.

**40.** For a list of instances in which the submissions of Lynch contain claims not contained in the Complaint, *see supra* at 991 n. 8.

**41.** A recent decision of the Third Circuit is consistent with *Hlinka*. In *Berger v. Edgewater Steel Co.*, 911 F.2d 911 (3d Cir.1990), an employee sued an employer which amended a pension plan so as to eliminate an early retirement subsidy. It was contended the amendment to the plan violated 29 U.S.C. § 1054(g), as amended, which prohibits an amendment to a plan so as to eliminate the early retirement benefits of employees who had met the conditions for the benefits prior to such amendment. The court observed that under *Hlinka* early retirement subsidies were not accrued benefits protected by ERISA. *Berger*, 911 F.2d at 918. It then stated section 1054(g), as amended, specifically prohibited the elimination of such benefits for which the conditions had been met. The court, however, upheld the denial of the employee's claim because he had not met the conditions for the benefits prior to their elimination. *Id.* at 918–19. Thus, *Berger* stands for the proposition that early retirement benefits are not protected by ERISA as unaccrued benefits, except as provided by section 1054(g), which protects them from elimination by amendment to a plan where the pre-amendment conditions were met by the employee. *See also Hlinka*, 863 F.2d at 284 n. 10 ("[Section 1054(g), as amended,] has no effect on the case before us because the company did not attempt to amend the early retirement provisions.").

*See also Ashenbaugh v. Crucible Inc., 1975 Salaried Retirement Plan*, 854 F.2d 1516 (3d

*Pennsylvania Teamsters & Employers Pension Fund,* 763 F.2d 574, 577 (3d Cir. 1985) (early retirement benefits are not accrued benefits); *Petrella v. NL Industries, Inc.,* 529 F.Supp. 1357 (D.N.J.1982) (early retirement benefits were not accrued or vested benefits and were not protected by ERISA against forfeiture).

In the instant case, Lynch claims the annuity contracts should have covered early retirement benefits. However, as discussed previously, the case law of this circuit is clear that early retirement benefits are not accrued benefits under ERISA and are therefore not protected by ERISA. Thus, Lynch has not raised a genuine issue of material fact showing the restructuring and reversion were illegal by arguing that the annuity contracts did not cover early retirement benefits.

Even if such benefits were deemed accrued benefits under ERISA, however, Lynch has not demonstrated such benefits were not covered by the annuity contract for the On–Going Plan. Hardy, the Assistant Vice President of MONY, which issued the annuity contracts, asserts the annuity contract for the On–Going Plan did in fact cover early retirement benefits for employees, including Lynch, who had met eligibility requirements. Hardy Cert., ¶ 7. Munter, a certified public accountant, and Nadler, a consulting actuary, make conclusory statements that the annuity contracts did not cover early retirement benefits. *See supra* at 1004 n. 38. In so concluding, Nadler does not refer to any support.

Munter refers to documents from which he inferred early retirement subsidies were not covered but does not say whether such documents were submitted as part of the record, and if they were, what these documents are. *Id.*

The submissions by Lynch do not appear to contain any support for his contention that the annuity contracts did not cover early retirement benefits except for the conclusory statements of Munter and Nadler, which, as mentioned, are unsupported by documents in the record. The factual predicate of the opinion of an expert must find some support in the record. *Shaw v. Strackhouse,* 920 F.2d 1135, 1139 (3d Cir.1990); *Pennsylvania Dental Ass'n v. Medical Service Asso.,* 745 F.2d 248, 262 (3d Cir.1984), *cert. denied,* 484 U.S. 851, 108 S.Ct. 153, 98 L.Ed.2d 109 (1987). An expert opinion which contains no support for factual assertions should be rejected.

> To hold that Rule 703 prevents a court from granting summary judgment against a party who relies solely on an expert's opinion that has no more basis in or out of the record than ... theoretical speculations would seriously undermine the policies of Rule 56. We are unwilling to impose the fruitless expenses of litigation that would result from such a limitation on the power of a court to grant summary judgment.

*Merit Motors, Inc. v. Chrysler Corp.,* 569 F.2d 666, 673 (D.C.Cir.1977). The object of Rule 56(e) "is not to replace conclusory allegations of the complaint or answer with

---

Cir.1988), *cert. denied,* 490 U.S. 1105, 109 S.Ct. 3155, 104 L.Ed.2d 1019 (1989), decided four months before *Hlinka.* In *Ashenbaugh,* the retirement plan was involuntarily partially terminated by the IRS following plant closings and layoffs by the employer. A number of laid-off employees sued for early retirement benefits. The court assumed for the sake of argument the plaintiffs' grievance arose after the amendments to 1054(g) took place. It then applied section 1054(g), as amended, even though early retirement benefits were eliminated not by plan amendment but because of partial plan termination. It held the employees were not entitled to early retirement subsidies because they had not met the pre-termination conditions for the benefits, including the minimum years of service. The court held that the early retirement benefits were therefore not accrued benefits

within the meaning of 1054(g) as amended. *See also Hoover,* 756 F.2d at 983 n. 13, also decided prior to *Hlinka* (section 1054(g) as amended includes early retirement subsidies within the group of accrued benefits protected from unauthorized reductions).

In any event, the amendments to section 1054(g) prohibiting the amendment to a plan so as to eliminate early retirement benefits for which the conditions were met occurred in August 1984 and are applicable only to plan years beginning after 31 December 1984. *See* Pub.L. No. 98–397, § 301, 98 Stat. 1426, 1451 (1984). Because the restructuring and reversion were effective 1 July 1984, section 1054(g), as amended, is not relevant to the instant case, to the extent the amendment to section 1054(g) makes early retirement benefits for which the conditions are met accrued benefits.

conclusory allegations of an affidavit." *Lujan v. National Wildlife Federation,* —— U.S. ——, 110 S.Ct. 3177, 3188, 111 L.Ed.2d 695 (1990).

Lynch has not supported his factual assertion that the annuity contracts did not cover early retirement subsidies and has not created a genuine issue of material fact with respect to the assertion of Hardy, based on first-hand knowledge, that the annuity contract did cover early retirement benefits. Accordingly, Lynch cannot as a matter of law claim the restructuring and reversion were illegal because the annuity contracts did not cover early retirement subsidies.

4. *The Management of the Salaried Plan and ERISA's Exclusive Benefit Rule and Fiduciary Duty Provisions*

At Point IV of his Opposition, Lynch asserts Stevens must restore to the Salaried Plan the "illegal profits made by the breach of fiduciary duty" in the amount of the $112 million recaptured by Stevens in the reversion. Opposition at 65. His argument that Stevens is obligated to restore the recaptured assets to the Salaried Plan appears to be premised on his assertion that the surplus occurred as a result of Salaried Plan management practices which violated ERISA's exclusive benefit rule and fiduciary duty provisions or which were otherwise improper.

The allegations of Lynch as to improper or illegal management practices by Stevens are considered in turn.

a. *The Management Practices of Stevens with Respect to the Salaried Plan and ERISA's Exclusive Benefit Rule and Fiduciary Duty Provisions*

In support of his claim that management of the Salaried Plan violated ERISA's Exclusive Benefit Rule and fiduciary duty provisions or were otherwise improper because it resulted in a benefit to Stevens, Lynch argues:

> [He] seeks to remedy the fiduciary abuses of Stevens in its management and investment of the Stevens Salaried Employee Salaried Plan. [He] points out that the Stevens Investment Committee deliberately set out to maximize the pension plan assets for purposes of Stevens [sic] recovery in a pension plan reversion. It is apparent that Stevens knew in 1981 that the Salaried Plan was approaching overfunding which Stevens could have merely remedied by reducing or eliminating future pension contributions to the plan. Instead, Stevens hired an investment manager ... to maximize pension plan assets by improperly and artificially inflating the stated value of such pension assets.... It is overwhelmingly evident that Stevens has manufactured the size of the asset reversion by abusing the pension plan assets and actuarial assumptions in order to profit itself.
>
> By inflating the pension plan with Company assets by means of Company separate accounts and short-term investment funding, Stevens has an immediate surplus which could be amortized with the actuary's help under a five-year "fair value".... The actuarial assumptions and funding methods were also aggressively altered by Tyner to reduce pension cost. In 1982, Tyner changed the existing conservative actuarial funding method of "aggregate" to the liberal "projected unit credit method" which gave Stevens an immediate $20 million surplus in the Salaried Employee Plan.

Opposition at 68–69.[42]

Munter also seems to contend management of the Salaried Plan was not for the exclusive benefit of participants because Salaried Plan investment practices resulted in a surplus which ultimately reverted back to Stevens.[43]

---

**42.** These assertions are the unsworn statements of counsel for Lynch and are inadequate to create an issue of material fact so as to defeat summary judgment. *Schoch,* 912 F.2d at 657. For a list of instances in which Lynch relies on unsworn allegations of Counsel, *see supra* at 999 n. 25.

**43.** Munter asserts:

These assertions are not within the parameters of the Complaint and are therefore not before this court for decision. However, even if Lynch had included them in the Complaint, they would fail as a matter of law.[44]

Conduct by an employer to benefit the plan is not a breach of fiduciary duties simply because it also benefits the employer. *Oster v. Barco of California Employees' Retirement Plan*, 869 F.2d 1215, 1217–18 (9th Cir.1988); *Hlinka*, 863 F.2d at 283; *Trenton v. Scott Paper Co.*, 832 F.2d 806, 809 (3d Cir.1987), *cert. denied*, 485 U.S. 1022, 108 S.Ct. 1576, 99 L.Ed.2d 891 (1988); *Morse*, 732 F.2d at 1146; *Bass*, 676 F.Supp. at 745. As the *Holliday* court stated:

> As the legislative history makes clear, ERISA recognizes the inherent tension between the desire that employees retire with adequate retirement income and the practical internal pressures exerted on the pension plan. While ERISA resolves this conflict resoundingly on the side of the employees, Congress did not intend the Act to penalize employers for exercising their decisions which are both in the best interests of the preservation of the fund and which are also not adverse to the employer's interests.

732 F.2d at 551. "While fiduciaries have a duty of loyalty to plan participants, " '[a]t the same time, ... they have a duty to keep [a plan] financially stable. The purpose of a [plan] is to provide benefits to as many intended beneficiaries as is economically possible while protecting the financial stability of the fund.' " *Oster*, 869 F.2d at 1218 (quoting *Elser v. I.A.M. National Pension Fund*, 684 F.2d 648, 656 (9th Cir. 1982)).

As is true of any financial manager or investor, the Defendants could not have known in undertaking particular investment and management strategies that such practices would produce profit rather than loss or a continuation of the status quo. The Defendants did not breach their fiduciary duties to be loyal to plan participants and to act for their exclusive benefit by managing the plan in such a way as ultimately proved profitable. It defies the purposes of ERISA to hold that employers should be penalized for managing a plan in a way best calculated to assure its continued financial viability. That such management or investment strategies have the incidental benefit to an employer of reducing its contributions does not alter this.

Lynch does not point to any specific provision of the law which renders investment and plan management strategies illegal simply because they prove successful. He only makes vague and conclusory statements as to "manipulation" of plan assets, "maximization" of the reversion amount, and "inflation" of plan assets. Opposition at 68–69. Such statements do not make out a claim that the restructuring and reversion were illegal, especially in light of the policy considerations weighing against holding plan administrators liable simply for successfully assuring the financial viability of a plan.

b. *Management of the Salaried Plan by Stevens and the Allegation of Fraud*

Lynch contends: "Stevens has fraudulently manipulated and increased the asset value of the Pension Plan in order to acquire a huge windfall in a pension asset reversion." Opposition at 65.[45] Lynch nei-

---

[I]t appears the [sic] Salaried Employee Pension Plan was not invested and managed for the exclusive benefit of the plan participants to meet plan liabilities since the plan had a stated fair value on December 31, 1980 [sic] (upon plan termination) of over $147 million which was not used exclusively to provide benefits to participants of this plan. Munter Cert. at 3–4.

**44.** For a list of instances in which the submissions of Lynch contain claims not contained in the Complaint, *see supra* at 991 n. 8.

**45.** Lynch also contends: "Stevens hired an investment manager ... to maximize pension plan assets by improperly and artificially inflating the stated value of such pension assets.... It is overwhelmingly evident that Stevens has manufactured the size of the asset reversion in order to profit itself." Opposition at 68. Immediately following these statements, at the beginning of the next paragraph, Lynch states: "By inflating the pension plan with Company assets by means of Company separate accounts and short-term investment funding Stevens had an immediate surplus which could be amortized

ther pleaded fraud in his Complaint nor do any of his submissions relative to the Motion support or even state a claim of fraud aside from this passing remark by counsel for Lynch.

Rule 9 of the Federal Rules of Civil Procedure requires a plaintiff to state a claim for fraud in a complaint "with particularity." Fed.R.Civ.P. 9. To the extent the statement by counsel for Lynch alleges fraud, such an allegation is not within the parameters of the Complaint and is therefore not before the court for consideration.[46]

c. *Use of Investment Managers and ERISA's Exclusive Benefit Rule*

■ Lynch seems to argue Stevens violated ERISA's exclusive benefit rule and fiduciary duty provisions by hiring an investment manager to increase profits when it knew the Salaried Plan was already overfunded: "It is apparent that Stevens knew in 1981 that the Salaried Plan was approaching overfunding which Stevens could have merely remedied by reducing or eliminating future pension contributions to the plan. Instead, Stevens hired an investment manager ... to maximize pension plan assets...." Opposition at 68.[47]

This assertion is not within the parameters of the Complaint and is therefore not before this court for decision. However, even if Lynch had included it in the Complaint, such claim would fail as a matter of law.[48]

ERISA expressly authorizes the use of investment managers. 29 U.S.C. § 1102(c)(3)[49]; 29 U.S.C. § 1103(a)(2).[50] Lynch has not cited to any authority which suggests that the use of investment managers by Stevens was somehow illegal or improper. Lynch only argues that the use of an investment manager was improper or illegal in the instant case because it promoted the success of Salaried Plan investments when the Salaried Plan already had sufficient assets to meet liabilities. As previously stated, Lynch cannot as a matter of law claim the restructuring and reversion were illegal simply because the management strategies of Stevens ultimately proved profitable.

d. *Increase in the Actuarial Assumptions and ERISA's Exclusive Benefit Rule and Fiduciary Duty Provisions*

■ Without explaining how such conduct was illegal, Lynch asserts: "The actu-

with the actuary's help under a five-year "fair value." *Id.* at 68-69. Accordingly, this reference by Lynch to an "artificial inflation" of Salaried Plan assets and the "manufacture" of the size of the asset is interpreted not as an allegation that size of the reversion was the result of fraud but as an allegation that the size of the reversion was the result of use of separate accounts and short-term investment funding.

In addition, it is observed these contentions are the unsworn allegations of counsel for Lynch and are therefore inadequate to create an issue of material fact so as to defeat summary judgment. *Schoch,* 912 F.2d at 657. For a list of instances in which Lynch relies on unsworn allegations of Counsel, *see supra* at 999 n. 25.

**46.** For a list of instances in which the submissions of Lynch contain claims not contained in the Complaint, *see supra* at 991 n. 8.

**47.** This assertion is the unsworn allegation of counsel for Lynch and is therefore inadequate to create an issue of material fact so as to defeat summary judgment. *Schoch,* 912 F.2d at 657. For a list of instances in which Lynch relies on unsworn allegations of Counsel, *see supra* at 999 n. 25.

**48.** For a list of instances in which the submissions of Lynch contain claims not contained in the Complaint, *see supra* at 991 n. 8.

**49.** Section 1102(c) provides in relevant part:

An employee benefit plan may provide—

\* \* \* \* \* \*

(3) that a person who is a named fiduciary with respect to control or management of the assets of the plan may appoint an investment manager or managers to manage (including the power to acquire and dispose of) any assets of a plan.

29 U.S.C. § 1102(c)(3) (1985).

**50.** Section 1103(a) provides in relevant part:

[A]ll assets of an employee benefit plan shall be held in trust by one or more trustees.... [T]he trustee or trustees shall have exclusive authority and discretion to manage and control the assets of the plan, except to the extent that—

\* \* \* \* \* \*

(2) authority to manage, acquire, or dispose of assets of the plan is delegated to one or more investment managers pursuant to section 1102(c)(3) of this title.

29 U.S.C. § 1103(a)(2) (1985).

arial assumptions and funding methods were also aggressively altered by Tyner to reduce pension cost. In 1982, Tyner changed the existing conservative actuarial funding method of 'aggregate' to the liberal 'projected unit credit method' which gave Stevens an immediate $20 million surplus in the Salaried Employee Plan." Opposition at 69.[51]

Nadler contends the increase in the actuarial assumption by Stevens for the investment rate of return for 1984 was improper.[52]

This claim is not within the parameters of the Complaint and is therefore not before this court for decision. However, even if Lynch had included this claim in the Complaint, such claim would fail as a matter of law.[53]

As stated previously, the actuarial assumptions for interest rates was increased from seven to nine percent and the method of funding changed from the aggregate to the projected unit method of funding. *See supra* at 984–985. ERISA authorizes use of the unit credit funding method. 29 U.S.C. § 1002(31).[54] The projected unit method of funding adopted by Stevens is a conservative form of the unit credit method of funding. Anderson Supp. Cert., ¶ 4. Both the changes in the actuarial assumption for interest rates and in the method of

funding decreased contributions by Stevens, which it sought to achieve in light of the overfunding of the Salaried Plan in 1983. *See supra* at 985. Lynch himself asserts the appropriate course of action for Stevens to have taken in light of the surplus was to reduce contributions to the Salaried Plan. Opposition at 68 ("Stevens knew in 1981 that the Salaried Plan was approaching overfunding which Stevens could have merely remedied by reducing or eliminating future pension contributions to the Plan.").

ERISA expressly authorizes the use of the funding method implemented by Stevens in 1983 and does not prohibit the increase of actuarial assumptions so as to decrease contributions in light of a surplus. Lynch does not create a genuine issue of material fact to defeat summary judgment by arguing that the Defendants "aggressively altered" assumptions for interest rates or changed the method of funding, steps which he at the same time concedes are appropriate in light of a surplus.

e. *Stevens' Alleged Use of Salaried Plan Assets for the Benefit of the Hourly Plan and ERISA's Exclusive Benefit Rule and Fiduciary Duty Provisions*

Lynch also seems to argue Stevens used assets of the Salaried Plan for the benefit

---

**51.** This assertion is an unsworn allegation of counsel for Lynch and is therefore inadequate to create an issue of material fact so as to defeat summary judgment. *Schoch*, 912 F.2d at 657. For a list of instances in which Lynch relies on unsworn allegations of Counsel, *see supra* at 999 n. 25.

**52.** Nadler states:

I do not believe that Stevens could reasonably increase the investment rate of return for the salaried employee pension plan for the plan year 1984.... [A]udit papers showed a loss in the master trust of $17 million.... With the reversion, Stevens intended to remove virtually all of the assets from the Salaried Employee Pension Plan.... On April 1, 1986 [sic], Stevens removed all of the assets from the Salaried Employee Pension Plan and transferred all of its assets ... to a separate trust account ... for MONY in order to guarantee the accrued benefits of the plan participants both retired and active for the period prior to July 1, 1984. Stevens, therefore, had no assets for investment purposes in the Sala-

ried Employee Pension Plan after the reversion and yet Stevens increased the investment rate of return in September 1984 from 7% to 8% and again in March 1985 ... from 8% to 9% for the plan year 1984.

Nadler Cert. at 3–4.

**53.** For a list of instances in which the submissions of Lynch contain claims not contained in the Complaint, *see supra* at 991 n. 8.

**54.** Section 1002(31) provides in relevant part:

The term "advance funding actuarial cost method" or "actuarial cost method" means a recognized actuarial technique utilized for establishing the amount and incidence of the annual actuarial cost of pension plan benefits and expenses. *Acceptable cost methods shall include* the accrued benefit cost method (*unit credit method*), the entry age normal cost method, the individual level premium cost method, the aggregate cost method, the attained age normal cost method, and the frozen initial liability cost method.

29 U.S.C. § 1002(31) (1985) (emphasis added).

of the Hourly Plan in violation of ERISA's exclusive benefit rule. Lynch contends:

> As part of the reversion process, pension funds were used from the Salaried Employee Salaried Plan to benefit the Hourly Salaried Plan. As a result, the Hourly Salaried Plan was overfunded by $25 million.... Plan assets are to be held for the exclusive benefit of the plan participants for the purpose of providing benefits to plan participants and their beneficiaries....

Opposition at 70.[55]

Munter also seems to assert assets from the Salaried Plan were improperly used to fund the Hourly Plan.[56] Munter asserts the Master Trust was not created for the exclusive benefit of Salaried Plan participants because Stevens used the Master Trust to offset contributions to the underfunded Hourly Plan account.[57]

This claim is not within the parameters of the Complaint, and is therefore not before this court for decision. However, even if Lynch had included this claim in his Complaint, the claim would fail as a matter of law.[58]

Lynch cannot claim as a matter of law the restructuring and reversion were illegal because of a misallocation of assets between the Salaried Plan and the Hourly Plan. It is undisputed it was Northern Trust, not the Defendants, which was responsible for allocating to each plan in the Master Trust their respective shares of the continuing contributions by Stevens. Holt Cert., ¶¶ 4, 6.

In addition, the submissions of Lynch do not even consistently and clearly support his assertion that Salaried Plan assets were used for the benefit of the Hourly Plan. The submissions contain mere speculation that this was so. Munter arrives at this conclusion only because he perceived an increase in the value of the assets of the Hourly Plan after the creation of the Master Trust and concluded the increase was *"apparently* to the detriment of the Salaried Plan." Munter Cert. at 5 (emphasis added). At the same time, he attributes the increase in the value of Hourly Plan assets to non-pension related contributions by Stevens. *Id.* In order to raise an issue of fact, an expert opinion must be based on facts contained in the record, not on mere speculation. *Shaw,* 920 F.2d at 1139. Accordingly, Lynch cannot defeat the Motion of the Defendants by claiming Salaried

---

**55.** This assertion is an unsworn allegation of counsel for Lynch and is therefore inadequate to create an issue of material fact so as to defeat summary judgment. *Schoch,* 912 F.2d at 657. For a list of instances in which Lynch relies on unsworn allegations of Counsel, *see supra* at 999 n. 25.

**56.** Munter reviewed various valuations of the Salaried Plan and Hourly Plan assets in 1981, and stated:

> [T]he Hourly Employee Pension Plan received an incremental 4 percentage point (4%) allocation for later investment gains *apparently* to the detriment of the Salaried Employee Pension Plan.

Munter Cert. at 5 (emphasis added). He seems to regard the increase in the value of Hourly Plan assets as the result of "manipulation of the pension asset valuation." *Id.* In the next paragraph, however, Munter speculates that the increase in the value of Hourly Plan assets was attributable to non-pension plan related contributions to the Master Trust by Stevens:

> In the Master Trust Agreement with the Northern Trust Company, Stevens Investment Committee provided ... the right to include assets which do not constitute part of the Master Trust for the purposes of determining

the value of all of the assets of the participating plan. Since this plan was reportedly overfunded, there would be no readily apparent reason to add assets to the plan in determining the value of all of the assets of such participating plan unless the Stevens Investment wished to increase the relative size of the Hourly Employee Pension Plan or that of the reversion assets available to be recovered at a pension plan.

Munter Cert. at 5.

**57.** Munter states:

> It is my opinion it is likely that the establishment of the Master Trust arrangement was done not for the exclusive benefit of the salaried employee plan participants but was designed to increase the assets of the Hourly Pension Plan (to reduce the required subsequent pension contributions by the Company) and to increase the size of the pension plan reversion to the Company from the Salaried Employee Pension funds.

Munter Cert. at 3.

**58.** For a list of instances in which the submissions of Lynch contain claims not contained in the Complaint, *see supra* at 991 n. 8.

Plan assets were used for the benefit of the Hourly Plan.

### f. Stevens' Alleged Use of Retiree Plan Assets for the Benefit of the Salaried Plan and ERISA's Exclusive Benefit Rule and Fiduciary Duty Provisions

Munter and Nadler make various assertions which seem to suggest Stevens used assets of the Retiree Plan for the benefit of the Salaried Plan in violation of ERISA's exclusive benefit rule and fiduciary duty provisions. After speculating based on the continued filing of the Form 5500 that the Retiree Plan was never terminated, Munter contends:

> It is apparent that Stevens is using the continuation of the retired plan in order to offset contributions required on behalf of the company for the continuation of the on-going plan. This is highly improper as the retired plan is to be terminated with a settlement of the assets and liabilities and the assets of one pension plan cannot be used to offset the liabilities of another pension plan.

Munter Cert. at 11.

This claim is not within the parameters of the Complaint and is therefore not before this court for decision. However, even if Lynch had included it in the Complaint, it would fail as a matter of law.[59]

As stated previously, Lynch cannot defeat this Motion by claiming Retiree Plan assets were used for the benefit of the Salaried Plan. As well, it is undisputed it was Northern Trust, not the Defendants, which was responsible for allocating to each plan in the Master Trust their shares

of Stevens' contributions. Holt Cert., ¶¶ 4, 6.

The assertion of Munter that the Retiree Plan was not terminated is merely his inference from the continued filing of the Form 5500. It is an unreasonable and unfounded inference. The Retiree Plan documents state the Retiree Plan was terminated on 1 July 1984. In addition, the Defendants' uncontroverted evidence shows that the IRS required the continued filing of this form until all Retiree Plan benefits payable under the annuity contract were distributed and the Defendants assert all such benefits have not been distributed. Retiree Plan at 1; Anderson Cert., ¶ 23; 25 June 1985 IRS Letter to Stevens. Moreover, Munter wildly speculates from the hypothesized continuation of the Retiree Plan that Retiree Plan assets were used for the benefit of the Salaried Plan. Such speculation is improper. Moreover, it is not based on anything in the record and cannot defeat a motion for summary judgment. See Shaw, 920 F.2d at 1139. Accordingly, Lynch cannot claim the restructuring and reversion were illegal because Retiree Plan assets were used for the benefit of the Hourly Plan.

### g. The Propriety of "Speculative" Investments and ERISA

While Lynch does not relate his arguments to his allegations of illegality by Stevens or state whether and how the activity they describe violate the law, Munter seems to suggest assets from the Salaried Plan were improperly invested in futures and options to create a surplus for Stevens, and improperly accounted for in the reversion process.[60]

---

**59.** For a list of instances in which the submissions of Lynch contain claims not contained in the Complaint, see supra at 991 n. 8.

**60.** Munter states:

> I must point out that the Master Trust total market value increased an incredible amount in two years approximately $100 million or fifty percent (50%) over its stated market value of December 31, 1981 (even in light of prevailing rate of return during this period) resulting in a total market valuation of nearly $300 million as of December 30, 1983.... It seems likely then that Stevens Investment

> Committee transferred a significant amount of the assets from the Salaried Employees Pension Plan in order to provide a funding base for the investment managers to invest in equity and fixed income investments for the Master Trust.... Thus, the Stevens Investment Committee could (and did) add or move assets within an investment manager's account in order to take advantage of a market value versus a book (cost) value or to increase or reduce the size of the investment managers account.... [I]t is quite evident that Stevens did transfer assets in and out of the investment account resulting in an exchange assets

This claim is not within the parameters of the Complaint and is therefore not before this court for decision. However, even if such claim had been included in the Complaint, it would fail as a matter of law.[61]

The allegations of Lynch point to no provision of law which was violated by the Defendants, but that only state investment in futures and options and other "speculative" investments was improper. Lynch does not go so far as to allege fraud or the misallocation of assets in these statements or that benefits accrued by Salaried Plan participants as of 30 June 1984 were not met.[62] While plan administrators have a fiduciary duty to investigate the merits of an investment prior to proceeding with it, *Fink v. National Savings & Trust Co.*, 772 F.2d 951, 956 (D.C.Cir.1985), *Katsaros v. Cody*, 744 F.2d 270, 279 (2d Cir.1984), *cert. denied*, 469 U.S. 1072, 105 S.Ct. 565, 83 L.Ed.2d 506 (1984), Lynch does not allege the investments in futures and options were poor investments or that they were not properly investigated beforehand. He merely vaguely suggests the investment in

futures and options was improper. Lynch therefore cannot claim the restructuring and reversion were illegal by virtue of investment of Salaried Plan assets in futures and options.

### h. *Segregation of Salaried Plan Assets and ERISA*

While Lynch does not relate his arguments to his allegations of illegality by Stevens or state whether and how the activity they describe violate the law, Munter appears to suggest a violation of the exclusive benefit rule, asserting the segregation of Salaried Plan assets prior to the restructuring and reversion was "not for the exclusive benefit of the Salaried Employee Plan participants but rather for the purpose of maximizing the reversion funds to the plan sponsor." Munter Cert. at 15.[63]

This claim is not within the parameters of the Complaint, and is therefore not before this court for decision. However, even if Lynch had included it in the Complaint, such claim would fail as a matter of

---

[sic] and removing the assets or reducing or changing the asset valuations.

Munter Cert. at 6. He later criticizes investments by Stevens in futures and options:

[C]ertain ... plan assets were pledged on "margin" to be used as collateral or security for futures or stock options.... Certainly, there was no apparent need to deal in futures and options for purposes of the reversion unless it was used to increase the size of the reversion. Such security dealing was for the benefit of the Company on reversion and not for the Salaried Employees Pension Plan participants.

Munter Cert. at 15. He later intimates investment in futures and options may have resulted in a reversion for an inappropriate amount:

Stevens should not use hedge accounting according to the audit work paper ... for the investments in futures and options. If futures *and options were transferred during the re*version process without proper accounting safeguards, it would be very difficult for the auditors to satisfactorily audit the reversion gain to Stevens....

Munter Supp. Cert. at 3. *See also* Munter Supp. Cert. at 4 ("Therefore one must conclude that the investment in futures and options transactions were speculative thus increasing the size of the reversion or assets transferred within the various investment accounts.").

**61.** For a list of instances in which the submissions of Lynch contain claims not contained in the Complaint, *see supra* at 991 n. 8.

**62.** Lynch does make such allegations elsewhere. For a description of these allegations and an explanation of why they do not survive the Motion, *see supra* at 1008–1009, 1010–1012.

**63.** Munter asserts:

It is my opinion that the segregation of ... plan assets was not for the exclusive benefit of the Salaried Employee Plan participants but rather the segregating the cash assets was for the purpose of maximizing the reversion funds to the plan sponsor.

Munter Cert. at 15. He also asserts:

Effective April 30, 1985 (Exhibit I) Stevens segregated the salaried account and MONY consolidated account *from* the master trust.... Additionally, it would appear to be inappropriate to place hourly employee pension assets with the salaried employee pension plan assets after there was a segregation of plan assets.

Munter Supp. Cert. at 5–6. Exhibit I is not identified by Lynch, but contains the heading "Notes to Financial Statements" and states: "Effective April 30, 1985, the Plan's assets were segregated from the Trust to facilitate the reversion program." *See* Munter Supp. Cert., Exhibit I.

law.[64]

While Lynch appears to assert Salaried Plan assets were segregated outside of the Master Trust and the Defendants assert they were segregated within the Master Trust, such a dispute does not raise a genuine issue of material fact. Even if Salaried Plan assets were segregated outside the Master Trust, Lynch points to no provision of law which makes such a measure illegal and it does not appear such an allegation without more states illegal conduct.

■ To the extent Munter states such segregation violated the exclusive benefit rule, his statement constitutes a legal conclusion. Legal conclusions are not within the ambit of expert testimony permitted under Rule 703 of the Federal Rules of Evidence. *Specht v. Jensen*, 853 F.2d 805, 808 (10th Cir.1988), *cert. denied*, 488 U.S. 1008, 109 S.Ct. 792, 102 L.Ed.2d 783 (1989); *Owen v. Kerr–McGee Corp.*, 698 F.2d 236, 239–40 (5th Cir.1983). In addition, Munter does not state a violation of the exclusive benefit rule by stating the segregation of Salaried Plan assets was for the benefit of Stevens. As stated earlier, an action taken by an employer is not a *per se* violation of ERISA's exclusive benefit rule simply because it has an incidental benefit to the employer.

### 5. *Notice to Salaried Plan Participants of the Restructuring of the Salaried Plan and ERISA*

■ At Point I of his Opposition, Lynch argues: "From the facts at hand, without knowledge of Lynch and other participants, Stevens has attempted to illegally terminate the basic salaried employee pension plan." Opposition at 50. Lynch continues:

> Without telling Lynch and other participants, Stevens has removed *all* the salaried employee pension plan assets on June 27, 1985 and had set aside assets for MONY in the amount of $124.9 million for the accrued benefits up to June

30, 1984 for the active employees and the salaried pensioners for such date. In its feeble disclosure attempt, Stevens was furnishing Lynch and the other active plan participants with a letter that attached the MONY annuity certificate for accrued benefits up to June 30, 1984. Stevens represented that accrued benefits after July 1, 1984 are guaranteed by the salaried employee pension plans....

Opposition at 50–51 (emphasis in original).

Lynch then argues that inadequate disclosure may constitute a breach of fiduciary duty and that disclosure requirements apply to decisions to terminate a plan. Lynch reviews the disclosure made by Stevens of the spinoff and termination and concludes:

> Obviously in this information setting, Lynch and others would have no knowledge that the Stevens original pension plan had been terminated. Nor would Lynch know that such pension plan had liabilities including the future pay liability of Lynch and others. Stevens had represented to Lynch and other participants that Lynch's original plan would continue in a spin-off termination and that the "retired" portion would terminate. Consequently, Stevens has breached its fiduciary duty of disclosure and Defendants have acted in bad faith so that the maximum amount of the pension asset reversion may take place with Lynch's pension benefits unprotected after July 1, 1984....

Opposition at 52–53.[65]

In support of his claim of inadequate disclosure, Lynch asserts in his certification:

> I am a plan participant of the Stevens On–Going Active Salaried Employee Salaried Plan, and I did not know that Stevens had attempted to terminate my pension plan effective January 1, 1985 but I believed that the plan had been "restruc-

---

**64.** For a list of instances in which the submissions of Lynch contain claims not contained in the Complaint, *see supra* at 991 n. 8.

**65.** These *unsworn allegations of counsel for Lynch are inadequate to create an issue of mate-*

rial fact so as to defeat summary judgment. *Schoch*, 912 F.2d at 657. For a list of instances in which Lynch relies on unsworn allegations of Counsel, *see supra* at 999 n. 25.

tured" and split into two plans with he excess pension assets being transferred to the company to the terminated spun off retired plan.

Lynch Cert. at 22.

The claim of inadequate disclosure is not within the parameters of the complaint and is therefore not before this court for decision. However, even if Lynch had included the claim in his Complaint, such claim would fail as a matter of law.[66]

As noted previously, the Joint Guidelines require that prior to a spin-off and termination, participants be notified of the transaction at the same time and in the same manner as would be required if the original plan were entirely terminated. 11 Pens. Rep. at 724. Section 1341 requires that a Notice of Intent to Terminate be filed with the PBGC at least ten days before a proposed termination date. 29 U.S.C. § 1341(a). In addition, PBGC regulations require that plan participants be notified no later than the date the Notice of Intent to Terminate is filed with the PBGC of the termination of the plan. They also require notice to participants of the date proposed for the plan termination. Finally, they require notice of the date on which the Notice of Intent to Terminate will be filed with the PBGC and of whether the plan administrator believes assets to be sufficient to provide vested benefits. 29 C.F.R. § 2616.4(a).

A plan administrator's failure to disclose information which must be disclosed pursuant to the disclosure requirements of ERISA may constitute a breach of the fiduciary duties of the plan administrator. *See, e.g., Genter v. Acme Scale & Supply Co.,* 776 F.2d 1180, 1185–86 (3d Cir.1985) (reversing the district court's granting of summary judgment to an employer who failed to disclose in summary plan description pursuant to 29 U.S.C. § 1022(a)(1) the availability of an increase in benefits). Additionally, while the decision to terminate a plan is a business decision and while an employer does not act in a fiduciary capacity in making such a decision, an affirma-

tive misrepresentation as to matters concerning a plan termination may constitute a breach of the employer. *Berlin,* 858 F.2d at 1163–64. *Cf. Peoria Union Stock Yards Co. Retirement Plan v. Penn Mut. Life Ins. Co.,* 698 F.2d 320, 326 (7th Cir. 1983) ("Lying is inconsistent with the duty of loyalty owed by all fiduciaries and codified in 29 U.S.C. § 1104(a)(1).").

There is no breach of fiduciary duties, however, where a plan administrator or employer provided the extent of the notice required by ERISA's disclosure requirements and where there is no affirmative misrepresentation. *Payonk v. HMW Industries, Inc.,* 883 F.2d 221, 226–29 (3d Cir.1989); *Porto v. Armco, Inc.,* 825 F.2d 1274 (8th Cir.1987), *cert. denied,* 485 U.S. 937, 108 S.Ct. 1114, 99 L.Ed.2d 274 (1988); *Stanton v. Gulf Oil Corp.,* 792 F.2d 432 (4th Cir.1986); *Morse,* 732 F.2d at 1147–48.

In the instant case, Stevens issued a press release and sent letters to Salaried Plan participants in April and May 1984 informing them the Salaried Plan would be restructured into two plans, one for active employees and one for retired employees, and advising them of its plan to recapture excess assets. In addition, as Lynch concedes, Stevens posted a Notice to Interested Parties which specifically informed Salaried Plan participants the plan for retired employees would be "technically 'terminated.'" Notice to Interested Parties; Lynch Cert. at 20. This was all the notice which Stevens was required to give under ERISA and the Joint Guidelines.

Lynch has not raised a genuine issue of material fact suggesting insufficient notice because his submissions are neither certified nor sworn to and are contradictory as to what it is he believes took place of which he received inadequate notice. He argues that in April 1984 "the Stevens Board of Directors approved a 'spin-off' termination of the Salaried Employees Salaried Plan into two plans." Opposition at 17. He later argues: "[T]he original Plan was terminated retroactive to June 30, 1984 by

---

**66.** For a list of instances in which the submissions of Lynch contain claims not contained in the Complaint, *see supra* at 991 n. 8.

IRS action in December 1986." Opposition at 24. Additionally he argues: "Stevens has terminated the original Salaried employees plan without notice to Lynch and other participants." Opposition at 56.

Elsewhere, Lynch characterizes the conduct of Stevens as a mere *"attempt[ ]* to illegally terminate the basic salaried employee pension plan." Opposition at 50; Lynch Cert. at 22 (emphasis added). In addition, he states outright the Salaried Plan was not terminated:

> Stevens has not terminated the original pension plan—only amended the plan to spin off the assets and liabilities of the accrued benefits of the "retired" pensioners. Such transfer of the original pension plan "retired" portion was effective June 26, 1985.

Opposition at 57. Nadler seems unsure of when and if the Salaried Plan was terminated, speculating that benefits for the period 1 July 1984 through 31 December 1984 were not met by the annuities *"[i]f* the active plan was terminated January 1, 1985." Nadler Cert. at 15–16 (emphasis added). Accordingly, Stevens cannot as a matter of law claim the restructuring and reversion were illegal because he received inadequate notice.

### B. *The Window* [67]

At Point III of his Opposition, Lynch variously argues the Window is not a bona fide pension benefit because it discriminatorily favored higher level employees and because it discriminated on the basis of age as a program targeted for employees above age 50. He states:

> Stevens' "window" is not a bona fide amendment to a pension plan. It is blatantly discriminatory in its design to favor high executives of divested divisions whose lower runged employees are released without the window increment.... It is apparent that Stevens has been engaging in systematic age dis-

crimination. Stevens [sic] 1984 "downsizing" plan in early 1984 was based on age with a comparison of the Rule 80 severance pay versus the window.... The window was directed at the above age 50 worker with the threat of job elimination.... In Lynch's case, Stevens was drawing the so called "corporate boundaries on the basis of age in the "window" on a predetermined job elimination screening. Stevens was purposely seeking to exclude persons in the protected class from a continuing job with Stevens. The "window" was discriminatorily designed to favor top divisional executives with substantial retirement incentives while at the same time, denying divisional employees both an employment position (a non fringe benefit) and the retirement incentive.

Opposition at 61–64.[68]

In the facts portion of his Opposition, Lynch seems to suggest the Window is not a bona fide pension benefit because while it was purportedly directed at corporate area employees, several allegedly non-corporate area executives had been offered the Window, including W.W. Stasney, who he alleges was the executive vice president of Delta Blends Division, George Archer, who he alleges was a senior marketing representative for the Woolen & Worsted Division, and Irwin Gusman, who he alleges was with the Finished Goods Division. Opposition at 32. He seems to further challenge the bona fides of the Window by asserting Paul Nipper was offered the Window but retained past the Window's deadline for retirement. Finally, Lynch states in his certification:

> From my review of the deposition transcripts of Thomas Durst (former Stevens Vice President of Human Resources), Paul Nipper, W.W. Stasney and Foy Fisher as well as my review of other documents obtained during discovery, it is quite apparent that the early retire-

---

**67.** While Lynch alleged in his Charge of Discrimination that he was denied the Window because of age discrimination, *see supra* at 989, his Complaint and submissions before this court do not raise such a claim. Such an allegation by Lynch is therefore not addressed.

**68.** These unsworn allegations by counsel for Lynch are inadequate to create an issue of material fact so as to defeat summary judgment. *Schoch,* 912 F.2d at 657. For a list of instances in which Lynch relies on unsworn allegations of Counsel, *see supra* at 999 n. 25.

ment window was a subterfuge to reward the corporate executives including Nipper, Gusman and Stasney.

Lynch Cert. at 11.

With respect to the denial to him of Window benefits, Lynch asserts he should have been granted Window benefits because at the time employees were first notified of the Window by Stevens, he and other "members of the International Division were considered a corporate expense and appeared as a corporate expense in company financial reports." Complaint at 6. He infers he was eligible for the Window as a corporate area employee from the fact that he was "considered 'New York corporate' for payroll and accounting purposes since he had a 701 'corporate code.'" Opposition at 42. He also asserts the International Division had excess employees in 1986 and had staff reductions planned for August 1986. Opposition at 46. At the same time, Lynch concedes "[he] was denied the [W]indow in part because the [application] deadline had expired." Opposition at 61.[69]

The ADEA makes it illegal for employers to refuse to hire, to fire or to discriminate against an employee "with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a).[70] The ADEA makes an exception to this general provision with respect to employers who "observe the terms of a bona fide ... employee benefit plan such as a retirement,

pension, or insurance plan, which is not a subterfuge to evade the purposes of this chapter." 29 U.S.C. § 623(f)(2).[71] A bona fide employee plan is defined as a plan which "exists and pays benefits." *Public Employees Retirement System v. Betts*, 492 U.S. 158, —, 109 S.Ct. 2854, 2860, 106 L.Ed.2d 134 (1989) (*"Betts I"*); *United Air Lines, Inc. v. McMann*, 434 U.S. 192, 206–07, 98 S.Ct. 444, 451–52, 54 L.Ed.2d 402 (1977).

In a recent decision, the Supreme Court defined what is meant by a "subterfuge" within the meaning of section 623(f)(2). In rejecting the definition set forth in Labor Department regulations as benefits which are not justified by age-related cost considerations, the Supreme Court reiterated "the term 'subterfuge' must be given its ordinary meaning as 'a scheme, plan, stratagem, or artifice of evasion.'" *Betts I*, 492 U.S. at —, 109 S.Ct. at 2861 (quoting *United Air Lines*, 434 U.S. at 203, 98 S.Ct. at 450).

The Court then proceeded to determine when an employee benefit provision constitutes such a subterfuge. The Court observed the purpose of the ADEA as being "'to promote employment of older persons based on their ability rather than age; to prohibit arbitrary age discrimination in employment; to help employers and workers find ways of meeting problems arising from the impact of age on employment.'" *Id.*, 109 S.Ct. at 2865 (quoting 29 U.S.C. § 621(b)). It determined from the legisla-

---

**69.** These unsworn allegations by counsel for Lynch are inadequate to create an issue of material fact so as to defeat summary judgment. *Schoch,* 912 F.2d at 657. For a list of instances in which Lynch relies on unsworn allegations of Counsel, *see supra* at 999 n. 25.

**70.** Section 623(a) provides:

It shall be unlawful for an employer—
(1) to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions or privileges of employment, because of such individual's age;
(2) to limit, segregate, or classify his employees in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's age; or

(3) to reduce the wage rate of any employee in order to comply with this chapter.
29 U.S.C. § 623(a).

**71.** Section 623(f) provides in relevant part:

It shall not be unlawful for an employer, employment agency, or labor organization—
(2) to observe the terms of a bona fide seniority system or any bona fide employee benefit plan such as a retirement, pension, or insurance plan, which is not a subterfuge to evade the purposes of this chapter, except that no such employee benefit plan shall excuse the failure to hire any individual, and no such seniority system or employee benefit plan shall require or permit the involuntary retirement of any individual specified by section 631(a) of this title because of the age of such individual.... 29 U.S.C. § 623(f)(2).

tive history of section 623(f)(2) that Congress meant to "[leave] the employee benefit battle for another day, and legislated only as to hiring and firing, wages and salaries, and other nonfringe-benefit terms and conditions of employment." *Id.* 109 S.Ct. at 2866.

The Court concluded an employee benefits plan is not a subterfuge within the meaning of section 623(f)(2) if it does not discriminate in other non-fringe benefits aspects of the employment relationship. *Id.* at 2866–67. It listed examples of such discrimination as a benefits formula which in effect retaliated against employees who complained of ADEA violations by the employer and a decision by an employer to reduce all salaries and to simultaneously increase benefits for younger employees. *Id.* at 2868.

In addition, the *Betts I* Court also acknowledged the rule set forth in *McMann* that a benefits plan which was implemented before the adoption of ADEA is insulated from challenge as a subterfuge. *Id.* 109 S.Ct. at 2862. However, it held a post-ADEA amendment to a plan will not be insulated from challenge as a subterfuge where it increases an age-based disparity in benefits. *Id.* at 2862.

Finally, the Court held in *Betts I* that when an employee brings an action against an employer claiming an employee benefits plan violates the ADEA, "the employee bears the burden of proving that the dis-criminatory plan provision actually was intended to serve the purpose of discriminating in some nonfringe-benefit aspect of the employment relation." *Id.* at 2868.

The Sixth Circuit applied the "subterfuge" analysis on remand of *Betts*. *Betts v. Hamilton County Bd. of Mental Retardation & Developmental Disabilities*, 897 F.2d 1380 (6th Cir.), *cert. denied*, —— U.S. ——, 111 S.Ct. 397, 112 L.Ed.2d 407 (1990) (*"Betts II"*). In *Betts II*, the court reconsidered a challenge by a sixty-one year old ill employee to a policy which denied the plaintiff, as an employee over age sixty, disability leave. Under the policy, the plaintiff was provided only with the option of unpaid medical leave or length-of-service retirement, at less than half the monthly compensation provided by disability leave. The court found for the plaintiff, determining that the policy constituted an "involuntary retirement" under section 623(f)(2). *Id.* at 1382–83.

Other courts since *Betts I* have denied actions by employees who claimed a benefit provision discriminated on the basis of age where the employee did not meet the burden of demonstrating the employer's intent to discriminate in some non-fringe benefit aspect of employment. *See, e.g., Robinson v. County of Fresno*, 882 F.2d 444, 447 (9th Cir.1989); *Gabarczyk v. Board of Educ. of City School Dist.*, 738 F.Supp. 118, 122 (S.D.N.Y.1990).[72]

---

**72.** In *EEOC v. Westinghouse Electric Corp.*, 907 F.2d 1354 (3d Cir.) (*"Westinghouse"*), *vacated*, 917 F.2d 124 (3d Cir.1990), the Third Circuit reconsidered a case remanded by the Supreme Court in light of *Betts I*. The Third Circuit vacated this decision on 20 September 1990 after it granted a panel rehearing. *See EEOC v. Westinghouse Electric Corp.*, 917 F.2d at 124. While the decision in *Westinghouse* was vacated, and is therefore without precedential value, the reasoning of *Westinghouse* is instructive to the instant case.

*Westinghouse* involved a challenge to a pre-ADEA severance plan which denied severance benefits to retirement-eligible laid-off employees. In addition, it involved a post-ADEA amendment to the severance plan which permitted retirement-eligible laid-off employees to elect severance benefits, with the accompanying recall rights, but which resulted in their forfeiting vested retirement benefits. The court found that the post-ADEA amendment to the severance plan increased age-based disparity in benefits and that the plan was therefore not insulated from challenge as a subterfuge. 907 F.2d at 1359.

The court found, however, the severance plan was a bona fide plan in that it existed and paid benefits, *id.* at 1361, and furthermore, that the amendment to the severance plan did not discriminate against employees with respect to non-fringe benefit aspects of employment because it did not discriminate against older workers with respect to recall or transfer rights. *Id.* at 1361–62. It therefore denied the challenge to the severance plan because the plan neither permitted nor required involuntary retirement:

> We do not believe that Congress intended § 4(f)(2) to reach circumstances like these where laid-off employees had the option to forego retirement and remain with the company on layoff while awaiting recall. Rather,

■ The Window did not, as a matter of law, violate the ADEA unless it discriminated against older employees in a non-fringe benefit aspect of employment. It is undisputed the Salaried Plan pre-dated the ADEA, having been adopted in 1948. Under the analysis of *Betts I*, therefore, the Window, as an amendment to the Salaried Plan, is insulated from challenge under the ADEA if it does not increase an age-based disparity in benefits. In this case, the Window merely expanded the class of employees eligible for full retirement benefits by lowering the age threshold for full retirement benefits. The Window did not increase an age-based disparity in benefits, therefore, but merely made the retirement benefits of some pre-retirement aged employees commensurate with those employees who reached normal retirement age.

■ Even if the Window did increase an aged-based disparity in benefits, Lynch has not stated any manner in which it discriminated against older employees in a non-fringe benefit aspect of employment except for this argument by counsel: "Stevens ... warned that job eliminations would take place if the window candidates did not take the 'window.' Thus, to the extent of that coercive 'warning,' the window was not 'voluntary'." Opposition at 60–61.

Courts have repeatedly found early retirement incentives to be voluntary in nature if the offenses were permitted to continue working. *Bodnar v. Synpol, Inc.*, 843 F.2d 190, 192 (5th Cir.1988), *cert. denied*, 488 U.S. 908, 109 S.Ct. 260, 102 L.Ed.2d 248 (1988). ("In general, an employer's adoption of an early retirement plan does not create a prima facie case of age discrimination under the ADEA."); *Henn v. National Geographic Soc.*, 819 F.2d 824, 826–28 (7th Cir.1987), *cert. denied*, 484 U.S. 964, 108 S.Ct. 454, 98 L.Ed.2d 394 (1987) (an early retirement incentive is not involuntary because it is "too good to refuse"; "[g]iven that ... the offer of early retirement is beneficial to the re-

cipient, there is no reason to treat every early retirement as presumptively an act of age discrimination."); *Cipriano v. Board of Education*, 785 F.2d 51, 56 (2d Cir.1986); *Gray v. New England Tel. & Tel. Co.*, 792 F.2d 251, 255 (1st Cir.1986); *Patterson v. Independent School Dist.*, 742 F.2d 465, 466–68 (8th Cir.1984); *Coburn v. Pan American World Airways, Inc.*, 711 F.2d 339, 344 (D.C.Cir.1983), *cert. denied*, 464 U.S. 994, 104 S.Ct. 488, 78 L.Ed.2d 683 (1983) (early retirement "is a human practice" that "supports not a hint of age discrimination."); *Ackerman v. Diamond Shamrock Corp.*, 670 F.2d 66, 71 (6th Cir. 1982) ("Diamond appears to have been rather generous with Ackerman. Rather than simply terminating him or switching him to a lower paying or less prestigious job, Diamond offered him an opportunity to retire with dignity.").

In addition, a threat by an employer that terminations would take place if insufficient numbers of employees accepted the early retirement incentive does not constitute a *prima facie* case of age discrimination if the risk of job eliminations is shared by all employees. *Bodnar*, 843 F.2d at 194 ("[The] risk inhered in eligible employees' failure to accept the [early retirement incentive], the risk that their jobs might be eliminated because of economic pressure on the company, is ... insufficient to suggest age discrimination.... Appellants' risk, if they stayed on, would be shared by all remaining employees of Synpol.").

It is not argued the alleged threat specified only Window offerees would be terminated if there were insufficient acceptances for the Window. Thus, Lynch does not contend that the Window was a scheme to eliminate the employment of specifically older employees and that it therefore discriminated against older employees in a non-fringe benefit aspect of employment.

Moreover, to the extent Lynch claims the Window was not voluntary because offerees were threatened with termination if

---

we think [section 623(f)(2)] proscribes the use of employee benefit plans as a means of forcing older workers off the job. The choice between retirement and unpaid layoff does

not constitute involuntary retirement where, as here, continued work was not an option for any of the affected employees, and the employee's layoff status was unrelated to age.

they did not accept it, such assertion is the unsupported, unsworn allegation of counsel and will not raise an issue of material fact to defeat summary judgment. As stated in a recent Third Circuit opinion:

> We have reviewed the memorandum plaintiff filed in the district court opposing the defendant's motion for summary judgment, and see there only contentions not supported by verified or documented materials. As the non-moving party bearing the burden of proof, plaintiff had the obligation to establish the existence of a genuine issue of material fact. That burden plaintiff failed to meet because his unsupported allegations in his memorandum and pleadings are insufficient to repel summary judgment.

*Schoch*, 912 F.2d at 657.[73]

 Lynch does not create a genuine issue of material fact by arguing the Window is not bona fide because Stevens did not observe its terms. Lynch maintains the Window is not a bona fide benefit provision because Stevens offered it to non-corporate area senior managers and because Stevens retained several acceptees of the Window past the date required by the Window for retirement.

An employee benefit plan does not fail to be bona fide, however, simply because an employer makes exceptions to the terms of the plan for certain employees. *Gabarczyk*, 738 F.Supp. at 123. The relevant question in determining whether the employer observed the terms of the plan so as to render it bona fide within the meaning of section 623(f)(2) is whether the employer followed the terms of the plan with respect to the employee who challenges the plan. *Sexton v. Beatrice Foods Co.*, 630 F.2d 478 (7th Cir.1980) (focusing on defendant's actions with respect to plaintiff to determine whether defendant observed terms of pension plan); *Gabarczyk*, 738 F.Supp. at 123.

Lynch concedes he was denied Window benefits in part because he missed the application deadline. Opposition at 61. Moreover, Lynch does not controvert the statement by the Defendants that a functional approach to identifying eligible corporate area employees was taken to designing eligibility for the Window and that accounting treatment of payroll expenses was not taken into consideration. *See* Durst Cert., ¶ 17, Zerrenner Dep. at 176. The design of a plan is purely a business decision. *Trenton*, 832 F.2d at 809; *Moore v. Reynolds Metals Co. Retirement Program for Salaried Employees*, 740 F.2d 454, 456 (6th Cir.1984), *cert. denied*, 469 U.S. 1109, 105 S.Ct. 786, 83 L.Ed.2d 780 (1985). Stevens was entitled to determine eligibility criteria for the Window. Under the definition it devised, and under the deadline for application it set, Lynch was ineligible for Window benefits. Accordingly, Lynch cannot as a matter of law claim the Window was not a *bona fide* benefit provision because its terms were not followed by Stevens.

 To the extent the allegations of Lynch constitute a claim pursuant to 29 U.S.C. § 1132(a)(1)(A) against Stevens for its decision to deny him Window benefits,[74] the decision of a plan administrator to deny benefits is reviewed under a *de novo* standard of review as a matter of contract construction, as held in a recent Supreme Court Decision. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 111–15, 109 S.Ct. 948, 954–57, 103 L.Ed.2d 80 (1989). As discussed previously, Lynch did not meet eligibility criteria for Window benefits and his application was properly denied by the Defendants.

### Conclusion

The Motion of the Defendants for summary judgment on the claims by Lynch

---

*Id.* at 1363 (citations omitted).

73. For a list of instances in which Lynch relies on unsworn allegations of Counsel, *see supra* at 999 n. 25.

74. In their submissions, the Defendants treated the claim by Lynch that he was improperly denied Window benefits as a claim that he was denied Window benefits because of age discrimination. Such treatment is not supported by the submissions of Lynch or by the Complaint, neither of which make such an allegation. Rather, the submissions of Lynch state a claim that he was improperly denied Window benefits because he was in fact a corporate area employee. This opinion therefore does not address whether Lynch may as a matter of law claim the denial to him of Window benefits violated the ADEA.

relating to the Window and the restructuring of the Salaried Plan and the reversion to Stevens of excess assets is granted. An appropriate order accompanies this opinion.